The Milwaukee Industrial School vs. The Supervisors of Milwaukee County.

THE MILWAUKEE INDUSTRIAL SCHOOL vs. THE SUPERVISORS OF MILWAUKEE COUNTY.

INDUSTRIAL SCHOOLS: CONSTITUTIONAL LAW: CONSTRUCTION OF STATUTES.
*(1) Power of commitment to industrial school, judicial. (2) Certain provisions of ch. 325 of 1875, independent and operative in part. (3) Statute not invalid because unfortunate children committed with criminals. (4) When parent not concluded by commitment. (5) Statute does not violate natural rights of parent and child. (6) Commitment to industrial school not an imprisonment.*

1. The power conferred in terms by sec. 5, ch. 325 of 1875, upon certain officers, for the commitment of minors to industrial schools, is *judicial*, and cannot be exercised by mayors of cities (3 Wis., 805); and probably not by judges of courts of record *at chambers* (39 Wis., 35); but any defect of jurisdiction in these will not affect the authority of courts under the act.

2. The provisions of said act as they affect each of the different classes of children described in sec. 5, are *independent;* and the statute might be inoperative as to one or more classes, and valid as to others. 27 Wis., 69.

3. The statute is not invalid because it authorizes children destitute by misfortune and children convicted of crime to be alike committed to industrial schools; especially as such commitment is subject to *judicial discretion.*

4. There being no provision in said act for service of process upon the parent or guardian, he is not precluded by a commitment under it (not made upon a conviction of the child for crime) from asserting any right to the custody and care of the child, which he may afterwards be able to establish; and if able to show that his disability or default on which the child's commitment proceeded no longer exists, and that he is not otherwise unsuitable for the custody of the child, he will be entitled thereto, notwithstanding such commitment.

5. The statute (which goes on the total failure of the parent to provide for the child) is not invalid on the ground that it invades any natural rights of parent and child.

6. The commitment of the child to an industrial school, as authorized by the statute, is not an *imprisonment*.

APPEAL from the Circuit Court for *Milwaukee* County.

The plaintiff (incorporated under ch. 325, Laws of 1875) sought to recover from the defendants for the board and tuition of certain children. The board of supervisors having disallowed the claim, an appeal was had to the circuit court. The children in question, whose ages varied from three to nine years, were committed to plaintiff's care upon a decree of the municipal court, which recited that a complaint had been made, as required by statute; that the children were inmates of the poor house of Milwaukee county; and that their welfare would be promoted by sending them to said industrial school, and there maintaining them at the expense of the county, until they should respectively attain the age of twenty-one years, or be sooner discharged as provided by the statute. It was admitted by counsel for plaintiff, that all children in said school were subject to the same rules and discipline; that one child had been committed to the school for larceny; that another had been committed for being an inmate of a house of ill fame; and that both of these were confined there together with the children in question.

Verdict for plaintiff; and, a motion for a new trial being denied, defendant appealed from the judgment.

*F. W. Cotzhausen*, for appellant:

The act providing for the organization of these industrial

schools is without parallel or precedent. It is contrary to the settled maxims upon which our government has habitually been conducted. It is attempted to break the family tie without adequate cause; to ignore the natural and well defined rights of parents to the society, care and education of their offspring; to submit children to this alienation from home, for what may be but a temporary disability of the parent; and to assign them, by one and the same inflexible rule, until twenty-one years of age, to the control of foreign guardians, at a house of refuge and correction, upon an *ex parte* examination and commitment. The prerogative of the state as *parens patriæ* is co-extensive with the jurisdiction exercised by courts of chancery over infants; and the state cannot constitutionally exercise any power beyond that. But it is only in cases of gross misconduct, that paternal rights may be interfered with. *In re Pulbrook*, 11 Jur., 185. Courts of equity interfere to prevent the abuse of parental authority. Forsyth on Infancy, 19, 52; Macpherson on Infancy, 14, 142; and see *Curtis v. Curtis*, 5 Jur., N. S., 1147; *DeManneville v. DeManneville*, 10 Ves., 61; *Wellesley v. Wellesley*, 2 Bligh, N. S., 124; *Wellesley v. The Duke of Beaufort*, 2 Russ., 1.

The act is unconstitutional, in as far as it arbitrarily and without notice interferes with the rights of parents to the care, custody and education of their children. It is also unconstitutional in as far as it restrains liberty for any cause except actual crime. *The People v. Turner*, 55 Ill., 280. And see comments of Judge REDFIELD on case last cited, in 10 Am. Law Reg., 372. The act is also unconstitutional in that the summary method of procedure which it prescribes is not due process of law. See opinion of THORNTON, J., in *People v. Turner, supra*.

*J. P. C. Cottrill*, for respondent:

The law is valid as a mere police regulation. The legislature has legislated for spendthrifts, insane persons, vagrants and drunkards, and has established an industrial school for

boys, and a soldiers' orphans' home. No question has hitherto been made of the validity of any such laws. They are common to all the states in substance, and the law in question is of like character. See, for decisions under similar laws, *Ex parte Crouse*, 4 Whart., 9; *People v. Governors, etc.*, 18 How. Pr., 409; *Roth v. House of Refuge*, 31 Md., 329; *Prescott v. State*, 19 Ohio St., 184; *S. C.*, 2 Am. Rep., 388. To the objection that the act was void because violating the rule as to due process of law, counsel cited *Rowan v. State*, 31 Wis., 129.

RYAN, C. J. We live in a time of inquiry and innovation, when many things having the sanction of time are questioned, and many novelties jarring with long accepted theories are proposed. In political science, there are those who would reduce government to a mere skeleton of absolutely necessary powers, purely political; and those who favor paternal government, recognizing in the sovereignty much of the authority of patriarchal rule. All this is seen chiefly in political discussions; but the late reports show that these conflicting theories are finding their way into judicial tribunals. The business of courts, however, is not to correct, but to administer, the existing system of government.

Some authorities cited in this case, and the logical tendency of part of the argument, would go to question the right of the state to make involuntary provision for the care of the destitute, whom misfortune or folly have rendered incapable of caring for themselves. But the political necessity and duty of the sovereignty to make provision for the care of subjects or citizens, unable for any cause to take care of themselves, and destitute of other care, has been too long recognized in all civilized countries, too well established under the state governments of this country, to be regarded as an open question. All public asylums, here and elsewhere in the country, for the poor, for the insane, for orphans, for the helpless and desti-

tute by any cause, are witnesses to the political necessity of public charity. And we assume, as a principle underlying every consideration in this case, that it is the duty and policy of the state to provide efficient means, in its discretion, for the care of all destitute and helpless persons within it; that public charity, in such cases, is a public necessity.

In fulfilling this duty, as in all things else, the power of the legislature is subject to all positive provisions of the constitution; perhaps to what Judge REDFIELD calls the abstractions of state constitutions; and to those natural and fundamental principles of right and justice, which are recognized in all civilized countries, and enter into all civilized governments. And the main question in this case is, whether the industrial school act, ch. 325 of 1875, in its essential provisions, is in conflict with any of these.

We confess that we approach the consideration of the statute with a strong desire to uphold it. Theoretically, the provision for the support of the poor is very well. Practically, poor houses are perhaps often, sometimes certainly, administered with as little attention to the comfort and as little respect for the persons of their inmates, as some of our prisons. They are not fit places for children; without means of intellectual, moral or religious instruction, or for the peculiar care needed by children, especially children within the age of nurture. And it is manifestly better for poor children that they should be supported in some other asylum, where they may have fitting culture and better care; where some person or body may stand to them *in loco parentis*, and measurably discharge towards them the parental duties of nurture and education.

If poor houses, certainly common jails and penitentiaries are unfit places for the confinement of children; even of ordinarily vicious children. In these it cannot be said that children are altogether without opportunities of education; but it is vicious education. All experience has shown the tendency

of prisons for crime, to aggravate the depravity of less guilty adult prisoners. The association with practiced criminals generally to be found in such places, which is almost necessary to confinement within them, must inevitably expose children to corrupting influences, which few children have character to resist. And when children must be confined for crime, common humanity to them, common regard for the future welfare of the state, requires, in many cases, that they should be sent to some place of detention more appropriate for them, where they may have a reasonable opportunity of becoming better, instead of worse, by their confinement; where the prison authorities are not their mere jailers, but are charged with parental duty as well as with parental authority; and where education for good is not only not excluded, but is made a condition of their restraint.

Such were doubtless the views of the legislature in passing ch. 325 of 1875 and ch. 142 of 1876. The latter act makes it the duty of the poor authorities throughout the state, to place healthy children as paupers, not in poor houses, but in families, orphan asylums or other appropriate institutions. The former act had already authorized the incorporation of industrial schools in every county, for the care and support of destitute children, and for the confinement of children convicted of crime. There might be constitutional difficulties or defects, in general or special provisions, in statutes of this character; but we think that even Judge REDFIELD would readily have recognized, not only their humanity, but their propriety, as reforms strictly within a proper legislative function, and not a meddlesome interference with private discretion or discipline. And we cannot forbear the remark that the general scope of these statutes, whatever defects there may be in their details, reflects honor upon the legislative bodies which passed them, and upon the state.

Notwithstanding this prepossession in favor of the statute before us, it is our duty to test all its provisions involved in

this case, by the letter and spirit of the constitution, and to hold the restraints and principles of that instrument sacred, as against any provision of any act of the legislature, however humane or benevolent.

Sections 1, 2, 3 and 9 provide for the incorporation and organization of industrial schools. Section 4 subjects the corporations to the same visitation and inspection of the state board of charities and reform as other state charitable and penal institutions.

Section 5 authorizes courts and officers having criminal jurisdiction, judges of courts of record and mayors of cities, to cause to be brought before them children between the ages and of the classes prescribed by the section.

The power conferred is clearly judicial, and cannot be exercised by mayors of cities (*Attorney General v. McDonald*, 3 Wis., 805); probably not by judges of courts of record at chambers. *Re Kindling*, 39 Wis., 35. Any defect of jurisdiction in them, however, could not affect the authority conferred on courts.

The provisions of the section include any male child under twelve, and female child under sixteen years of age, coming within either of these conditions: " That is begging or receiving alms, whether actually or under pretense of selling or offering for sale anything, or being in any public street or place for the purpose of begging or receiving alms; or that is found wandering and not having any home or settled place of abode, proper guardianship or means of subsistence; or is found destitute either by being an orphan or having a parent or parents who is undergoing imprisonment or otherwise; or that frequents the company of reputed thieves, or of lewd, wanton or lascivious persons in speech or behavior, or notorious resorts of bad characters; or that is found wandering in streets, alleys or public places, and belonging to that class of children called 'ragpickers;' or that is an inmate of any house of ill fame or poor house, whether in company with its parent or parents or

otherwise; or who has been abandoned in any way by his parent or parents or guardians; or who is without means of subsistence or support."

There is diversity of conditions in these several classifications, and some of them were severely criticised on the argument, and may perhaps be open to criticism. In this case, we have only to do with the provision relating to inmates of poor houses. And, without indicating any opinion as to the other classes of children embraced in the section, it is sufficient to say here, that the provisions of the statute, as they affect each class of children, are independent. The statute might be inoperative as to one class or classes, and valid as to other class or classes. *Lynch v. The Economy*, 27 Wis., 69.

Courts and officers before whom a child within the conditions of the section may be brought, " if satisfied on inquiry of the fact, and that the welfare of such child will be promoted thereby, may order such child to be sent to an industrial school in his own county, if there be one, and if not, to one in another county; and may direct such child to be kept and maintained in such school, at the expense of the county, until twenty-one years of age, or earlier discharged, as provided later in the act." The rest of the section makes similar provision for sending children convicted of crime to such schools.

It seemed to be assumed on the argument, that the power of courts to send children to these schools under either branch of the provision, was peremptory. But we think that it rests clearly in discretion, controlled by the welfare of the child. And we should have been inclined to hold the term of commitment, during minority, to be also discretionary (*Cutler v. Howard*, 9 Wis., 309; *Market Bank v. Hogan*, 21 id., 317; *Dutcher v. Dutcher*, 39 id., 651), if the language of this section had not been controlled by the provision in sec. 7, that all sentences and commitments shall be until majority.

Sec. 6 authorizes industrial schools to receive children so sent to them, and thereupon to take exclusive custody, care

and guardianship of such children, until discharged therefrom. The rest of the section is confined to provisions authorizing children to be sent to these schools, under certain conditions, by authority of their parents; provisions not involved in the consideration of this case. Sec. 7 authorizes the officers of the schools to discharge children sent to them by judicial authority, before majority, when in their judgment it shall be for the interest of the children. Sec. 8 gives authority to the officers of the schools to detain children sent to them by judicial authority; makes provision for the proper education of the children in the schools, and gives discretion to the officers to bind out the children as apprentices, or to give them to suitable persons for adoption during minority.

It was strongly objected to the statute, that it authorizes the same disposition of children destitute by misfortune, and of children convicted of crime; committing them alike to these schools, during minority, there to associate together. It must be remembered, however, that this evil, if evil it be, is subject to judicial discretion, and that in sentencing criminal children courts will not overlook the discretion to confine them in ordinary prisons or in these schools, or the degree of depravity of convicted children, or the liability of destitute children in these schools to be demoralized by association. Children guilty of crime are not always, perhaps not often, so depraved as to make their presence in such schools dangerous to their associates. The state, providing for children dependent upon it, whether from indigence or crime, has an essential discretion in the manner of doing so. And it appears to have been in the mind of the legislature, that children guilty of accidental offenses might be more sure to gain than children destitute by misfortune would be to lose by the association, under the careful discipline provided by the act, subject to the supervision of the state board of charities and reform. But, if the objection were as grave as represented, it would be a defect of detail only, not of power; a blemish, not surprising in the in-

fancy of so benign a reform, and readily to be obviated in time by amendment of the statute.

Such commitments of destitute children were stigmatized as the punishment of poverty as a crime. We have already sufficiently expressed our opinion that the removal of children from poor houses to these schools is mercy, not punishment.

Such commitments of poor children were denounced as an arbitrary interference with the natural affections and relations of parent and child; as an arbitrary invasion of natural and inalienable rights of both parent and child. As will be presently seen, we cannot consider the statute as authorizing the separation of parent and child, when the parent is able and willing to perform his duty to the child. And when a parent is unable or unwilling to provide for his child, and leaves the child dependent on the charity of the state, we are at a loss to comprehend the right of the parent to object to the form which the state gives to its charity, with intelligent regard for the welfare of the child. And, as regards the right of the child infringed by such considerate benevolence exercised towards it by the state, on which misfortune has made it dependent, we can only say that we have little consideration for the inalienable right of idleness, ignorance and vice, or for the care or want of care which fosters it.

The gravest objection, however, made to the statute is, that the commitment of a child to one of these schools until majority, except for crime, operates as an imprisonment of the child for that period, without due process of law, and that the statute authorizing it is therefore a positive violation of the constitution. We will consider this objection separately, as it affects the right of the child, and as it affects the right of the parent.

And, in the first place, we cannot understand that the detention of the child at one of these schools should be considered as imprisonment, any more than its detention in the poor house; any more than the detention of any child at any board-

ing school, standing, for the time, *in loco parentis* to the child. Parental authority implies restraint, not imprisonment. And every school must necessarily exercise some measure of the parental power of restraint over children committed to it. And when the state, as *parens patriæ*, is compelled by the misfortune of a child to assume for it parental duty, and to charge itself with its nurture, it is compelled also to assume parental authority over it. This authority must necessarily be delegated to those to whom the state delegates the nurture and education of the child. The state does not, indeed we might say could not, intrude this assumption of authority between parent and child standing in no need of it. It assumes it only upon the destitution and necessity of the child, arising from want or default of parents. And, in exercising a wholesome parental restraint over the child, it can be properly said to imprison the child, no more than the tenderest parent exercising like power of restraint over children. This seems too plain to need authority; but the cases cited for the respondent, and others, amply sustain our view.

In the second place, the statute, certainly so far as it is involved here, does not go on failure in the measure of support or education by the parent, on some nice fault-finding with the course of the parent with the child, as the court appeared to think that the Illinois statute did, in *People v. Turner*, 55 Ill., 280. It goes on the total failure of the parent to provide for the child. And it is difficult to comprehend the right of a parent to complain, that the discharge by the state of his own duty to his child, which he has wholly failed to perform, is an imprisonment of the child as against his parental right in it.

It was argued, however, that the disability of a parent to support his child might well be accidental or temporary; and that the commitment until majority would operate as an imprisonment of the child, as against both parent and child, in cases where the parent should afterward be able and willing

to resume the nurture and education of the child. This objection would have great weight, if it would not be fatal to the validity of the statute, were it well founded. We could not think it removed by the discretionary authority of the officers of these schools, to discharge the child in such a case. We are of course not now speaking of commitments for crime, but only of commitments for the causes which may be classed as misfortune. In the latter case, we should be very reluctant to hold the power of the state to survive the disability or default of the parent. And the right of the parent to resume the care of his child, in proper circumstances, should not be dependent on the discretion of the school officers.

But we cannot consider the statute, in its true construction, open to the objection. We cannot think that it was intended to foreclose the right of a parent, when competent, to resume the custody and care of his child. In this respect, there is a significant difference between it and the statute before the court in *People v. Turner.* That statute provided for process against the parent or guardian of the child; making them parties to the proceeding and apparently bound by it. The statute before us carefully avoids that difficulty; and operates, so to speak, upon the child *in personam,* without citing the parent or guardian, without any color of intent to bind the parent or guardian by the proceeding or by the commitment. It appears to us quite obvious, upon familiar principles, that the parent or guardian is not precluded by the commitment from asserting any right to the custody and care of the child, which he may be afterwards able to establish. When a parent or other proper guardian should be able to show that the disability or default on which the child's commitment proceeded was accidental or temporary, and no longer exists, and that he is, in the language of sec. 5, ch. 112, R. S., not otherwise unsuitable for the custody of the child, his right to the custody should prevail over the commitment to which he was not a party. In such a case, if the officers of a school should re-

fuse to surrender a child, no court would hesitate to restore the child to the care of the parent or guardian. The commitment during minority binds the child only; not the parent or guardian, when competent to fulfill towards the child the duties assumed by the state. It is conclusive as between the school and the child; but not as between the school and the parent or guardian. The statute is a humane one, and should not be bent to a construction inconsistent with one of the dearest rights of humanity. It is our duty to give it a construction, if we can, to give it effect. And we find no difficulty in giving it this construction, which seems to us to have been in the mind of the legislature when it was framed.

We have already given reasons for calling the statute humane; but there is another worthy of notice, as showing the considerate and benevolent spirit in which it was framed. Women alone, or women and men, but not men alone, may incorporate themselves under the statute. Thus no industrial school can be without the sex which is by nature best qualified for the nurture of children. Such charities are best committed to women, in whole or in part. And in such lies the truest and noblest scope for the public activities of women, in the time which they can spare from their primary domestic duties. Such a statute, so framed and so guarded, is not an arbitrary assumption of meddlesome authority, outside of the scope of the proper function of legislation; but is evidence that public charity is here losing the offensive and oppressive character sometimes attributed to it.

The case of *People v. Turner* appears to turn on the question of compulsory education, a very different question from that here. We are not prepared to say that we might not decide a similar case, under a similar statute, in the same way. But there is much said in the opinion inconsistent with some of the views which we have expressed, to which we could not assent, and which has failed to change our views of this case. We were greatly interested in the note appended to that case,

and to which we were specially referred (10 Am. Law. Reg., N. S., 372,) by that great jurist and gifted man, the late Chief Justice REDFIELD. But it appears to us that, though his approval of the decision is unqualified, his approval of the opinion is less so. The burden of his comments is against meddlesome legislative interference in private relations and private duties, under the name of reform; against theories tending greatly or wholly to substitute the authority of the state, as *parens patriæ*, for parental authority and domestic discipline. With much that he says on this topic, we might cordially agree.. And we think that none of the views which he expresses are in conflict with ours of this case. Some of his views struck us so forcibly as to lead us into the remarks made in the opening of this opinion. There is, in his suggestions, instruction to all courts to distinguish, as we trust we have distinguished in this case, between the proper scope of legislative authority, and mischievous meddling by statute with matters of purely private concern, and especially with the natural and sacred relation of parent and child.

It is so apparent to us that this statute does not go to disturb the uniformty of county government, that we do not think it necessary to discuss it. We did not understand counsel as seriously relying upon the point.

*By the Court.* — The judgment of the court below is affirmed.