# Ex Parte LOVING.

### In Banc, December 9, 1903.

1. **Statute: CONSTITUTIONALITY: DOUBT.** If there is a reasonable doubt as to the constitutionality of a statute, such doubt must be resolved in favor of its validity.

2. ———: ———: **TITLE.** The title to a statute which is, "An act to regulate the treatment and control of neglected and delinquent children in counties having a population of 150,000 inhabitants and over," has but one subject, and that is children. The terms "neglected and delinquent children" refer to two classes of children, but not to two different subjects.

3. ———: ———: **SPECIAL OR LOCAL LAW.** The terms of the juvenile-court statute, restricting its provisions and application to counties "having 150,000 inhabitants and over," are not sufficient to stamp it a special or local law. Such a provision has application to counties which in the future may acquire the population designated in the statute.

4. ———: ———: ———: **GENERAL LAW: APPLICABILITY.** The Legislature has the power to reach out and furnish to densely populated cities such legislation as conditions require, which would be totally impracticable to the rural districts of the State. It has the power, if it deems it wise, to furnish to a class of children living in densely populated cities, an opportunity for reform, which it is not necessary to extend to other counties where families live far apart and parental authority is ever present.

5. ———: ———: ———: ———: **DIFFERENT PROCEDURE.** A law which establishes a juvenile court for "neglected and delinquent children in counties having a population of 150,000 and over," and provides a rule of procedure and punishment for such children which is not applicable to the same class of children in other counties, is not unconstitutional as being special or local legislation.

6. ———: ———: **SEGREGATION OF CHILDREN.** A statute is not unconstitutional which provides for the confinement of "neglected and delinquent children" under the age of sixteen years in the reform school, simply because it does not provide for the separation of the neglected child from the delinquent child. That may be a defect of legislation, but not one of power, and if such, the remedy is by an amendment of the statute.

7. ———: ———: CONFLICT WITH CHARTER. The provisions of the charter of a city, if in conflict with a general statute applicable to all cities having a certain population, are inoperative. So that if the ordinance and charter of a city providing for the apprehension and punishment of children in the police court, are in conflict with a general law afterwards enacted which provides a juvenile court in all cities having a certain population for the trial and confinement in the reform school of "neglected or delinquent children" under sixteen years of age, those provisions of the charter and ordinance, in so far as they conflict therewith, become inoperative.

## Habeas Corpus.

PETITIONER REMANDED TO CUSTODY OF SHÉRIFF.

*Frank Gordon* for petitioner.

(1)   The Act of March 23, 1903, offends the organic law, in this:  It is a "local law," enacted to partly repeal "a general law."   "Nor shall the General Assembly indirectly enact such special or local law by the partial repeal of a general law."   Art. 4, sec. 53, Constitution; State v. Buchardt, 145 Mo. 84; Cooley's Con. Lim. (6 Ed.), 482; State v. Hill, 147 Mo. 63; State ex rel. v. Pond, 93 Mo. 636; Holden v. James, 11 Mass. 369; Lewis v. Webb, 3 Me. 326; Wally's Heirs v. Kennedy, 2 Yerg. (Tenn.) 544; Woodard v. Brien, 14 Lea (Tenn.) 563; Hatcher v. State, 12 Lea 368.   (2)   It violates the following provisions of article 4, section 53, Constitution:   "In all other cases where a general law can be made applicable no local or special law can be enacted, and whether a general law could have been applicable in any case is hereby declared a judicial question, and as such shall be judicially determined, without regard to any legislative assertion on that subject." State ex rel. v. Hermann, 75 Mo. 340; State ex rel. v. County Court, 89 Mo. 237; Rutherford v. Heddens, 82 Mo. 90; Dunne v. Railroad, 131 Mo. 5; State v. Anslinger, 71 S. W. 1041; State ex rel. v. Hammar, 42 N. J. L. 435; State v. DesMoines, 31 L. R. A. 186; Devine v.

Commissioners, 84 Ill. 590; Kerrigan v. Force, 68 N. Y. 381; People v. Supervisors, 43 N. Y. 21; State ex inf. v. Borden, 164 Mo. 236; Topeka v. Gillett, 32 Kan. 431; State v. Mayor, 45 N. J. L. 247; Coutieri v. Mayor, 44 N. J. L. 58; Railroad v. Gregory, 15 Ill. 20; State v. Miller, 100 Mo. 448; Henderson v. Koenig, 168 Mo. 372. (3)  Under the Constitution of Missouri it is not permissible to permit the same offense or violation of some public or general law by one species of punishment in one locality and by a different and more heavy punishment in other localities in this State.   Art. 4, sec. 53, Const.; State v. Pond, 93 Mo. 636; Cooley's Const. Lim. (6 Ed.), 481; State v. Julow, 129 Mo. 176; State v. Walsh, 136 Mo. 406; State v. Thomas, 138 Mo. 100; State v. Buchardt, 144 Mo. 83; State v. Anslinger, 71 S. W. 1041.   (4)   The act is void for want of adequate provisions to carry out its conditions.   State ex inf. v. Railroad, 145 Mo. 155.

*John A. Sea* also for petitioner.

(1)   The act is in conflict with the organic law in this: It contains more than one subject.  Sec. 28, art. 4, Constitution.  It provides for two classes of persons; one as "neglected children," the other "delinquent children."   The classes are entirely distinct; different methods are provided for each, both as to care and methods of procedure.   (2)   It is in conflict with, and offends the organic law of this State in this: It is both a local and a special law; either would condemn it.  The General Assembly shall not pass any local or special law.   Sec. 53, art. 4, Const.; Henderson v. Koenig, 168 Mo. 356; State ex rel. v. Herrmann, 75 Mo. 340; State ex rel. v. Jackson County, 89 Mo. 237; State v. Anslinger, supra.   (a)   This act applies only to Jackson county and the city of St. Louis as much so as if they had been specifically named.   Jackson county is the only county in the State having the requi-

site population. The act emphasizes the local idea by declaring that St. Louis shall be deemed a county for purposes of act.   (b)   The act relates to present existing state of facts, speaking of counties "having a population of 150,000;" in section 21 it speaks of no adequate provisions "existing" in counties "having" such population, all in present tense and bringing act clearly within rule of State ex rel. v. Jackson County, 89 Mo. 237, and while there are words in the act looking to future action, these words refer to the action of the court as established, and not to new courts.   State ex rel. v. Herrmann, supra; State ex rel. v. Jackson Co., supra. (c)   It creates a local court with local jurisdiction in Jackson county and city of St. Louis.   The local idea is further strengthened and made more manifest by section 4 of said act, which gives residents of such counties the right to file information as to neglected children, which right is denied residents of other counties, although such non-residents might have full knowledge of facts on which the court should pass.   (d)   It creates rights in Jackson county and St. Louis in certain cases not given in other parts of the State, i. e., trial by jury for violation of city ordinances and takes away rights, i. e., trial by jury in other cases in same places. (e)   The act in section 5 says the proceedings shall be summary, and in section 19 it says in same proceeding court may inquire into ability of parent to support neglected child and enforce its judgment (for costs in one case, and support in the other) by execution, thus in Jackson county and city of St. Louis, disposing of property of the citizens in a summary manner, not authorized elsewhere in the State.   It is within the rule of State ex inf. v. Washburn, 167 Mo. 689.   (f)   The act is both local and special in this: it punishes an offense in violation of a general State law, co-extensive with the territorial jurisdiction of the legislative body enacting it, by a different punishment and in a different manner in Jackson county and in the city of St. Louis than it

does elsewhere in the State.   State v. Anslinger, supra; State v. Buchardt, 144 Mo. 83.   (g) It singles out from a class of children existing in all parts of the State, a part resident in these two places and subjects them to punishment and penalties different from that to which others of the same class, resident elsewhere in the State, are liable.   It divides a natural class into two portions, making two classes out of one, and thus in effect enacts different rules for the government of each.   State v. Thomas, 138 Mo. 101; State v. Washburn, 167 Mo. 689; State ex rel. v. Somer's Point, 52 N. J. L. 32, 6 L. R. A. 57; State ex rel. v. Wood, 49 N. J. L. 88, 7 Atl. 286; State v. Gritzner, 134 Mo. 529.   (h)   This is vicious legislation whether one county or six counties are within the terms of the act, the remaining portion of the State being excluded.   State v. Walsh, 136 Mo. 400; State ex inf. Washburn, supra; State v. Gritzner, supra.   (3) A law is local when, instead of relating to and being binding upon all persons, corporations or institutions to which it may be made applicable, within the entire territorial jurisdiction of the lawmaking power, it is limited in its operation to certain districts of such territory or to certain individual persons or corporations.   Henderson v. Koenig, supra; State v. Anslinger, supra.   It makes Jackson county liable for costs which are taxed in a case, although the matter may be purely one arising from the violation of a city ordinance, using county funds for city purposes, and placing on county burden of a civil matter.   Conlin v. Board, 114 Cal. 404; Morrison v. Bachert, 112 Pa. 322.   (4)   A general law being applicable, the power to pass a local or special act is absent.   State v. Anslinger, 71 S. W. 1044; Henderson v. Koenig, 168 Mo. 377; State v. Hill, 147 Mo.; State v. Granneman, 132 Mo. 331.   (5)   It is nugatory and void for want of adequate provisions in the law to carry out its execution.   State ex inf. v. Railroad, 145 Mo. 155.

*Roland Hughes, Gardiner Lathrop, James. P. Gilmore, J. V. C. Karnes, Alfred Gregory, Seddon & Blair* and *J. Henry Altschu* for respondent.

(1)   The act is not in violation of section 53, article 4, of the Constitution of the State of Missouri.   Ex Parte Lucas, 160 Mo. 218; Kansas City v. Stegmiller, 151 Mo. 189; State ex rel v. Marion County Court, 128 Mo. 427; State ex rel. v. Wofford, 121 Mo. 61; Ewing v. Hoblitzelle, 85 Mo. 64; State ex rel. v. Tolle, 71 Mo. 645; Lynch v. Murphy, 119 Mo. 163; Rutherford v. Hamilton, 97 Mo. 543; Rutherford v. Heddins, 82 Mo. 388; sec. 16, art. 9, Constitution.   (2)   The act is not in violation of sections 1 and 10, article 10, of the Constitution.   State ex rel. v. Owsley, 122 Mo. 68; Young v. Kansas City, 152 Mo. 661; State ex rel. v. Mason, 153 Mo. 23; State ex rel. v. Board, 141 Mo. 45; State ex rel. v. Field, 119 Mo. 593; State ex rel. v. Pike County, 144 Mo. 275; State ex rel. v. Holladay, 70 Mo. 137; State ex rel. v. County Court, 34 Mo. 546.   (3)   It is the duty of the court to uphold this act unless it plainly and clearly violates the Constitution.   State ex rel. v. Aloe, 152 Mo. 477; State v. Thompson, 144 Mo. 322; State ex rel. v. Pike County, 144 Mo. 277; Kelly v. Meeks, 87 Mo. 396; Ewing v. Hoblitzelle, 85 Mo. 64; State v. Able, 65 Mo. 357.

FOX, J.—The facts in the case at bar are practically admitted.   The petitioner, James Loving, was arrested and charged with petit larceny, committed in Jackson county.   The petitioner is a boy eight years of age, and was brought before the juvenile court of Jackson county.   The case was heard by the judge of the juvenile court, who, having heard the facts, found the defendant guilty, and thereupon the following judgment was made and entered of record in the records of said county:

"The State of Missouri v. James Loving.

"Now on this day comes the prosecuting attorney of Jackson county, Missouri, and files information charging said James Loving with petit larceny, upon which information a warrant was issued and said defendant was brought into court, and Frank Gordon, Esq., appears in court as attorney for said defendant, and in his behalf pleads not guilty.

"And the court, after hearing all of the evidence adduced, and being fully advised in the premises, finds that the defendant is guilty of a misdemeanor, that he is a delinquent child, and that he is eight years of age. The court further finds that the parents of said defendant have not exercised the needed care and control over said defendant, and that he be committed to the State Reform School for Boys, and that his said parents are indigent, and that neither they nor the said defendant have any property or estate out of which the expenses of conveying said defendant to and his detention in said school can be paid.

"It is therefore ordered and adjudged by the court that the said James Loving be and is hereby committed to the guardianship of said State Reform School for Boys, at Boonville, Cooper county, Missouri, there to remain for the full period of two years.

"It is further ordered and adjudged that the said James Loving be and is hereby committed to the custody of the sheriff of Jackson county, Missouri, and that said sheriff deliver said James Loving into the custody of the proper officer in charge of said State Reform School.

"It is further ordered and adjudged by the court that the county court of Jackson county, Missouri, pay the necessary expenses incurred by said sheriff in conveying said James Loving to and of his detention in said Reform School."

A writ of habeas corpus was sued out by the mother of the petitioner, and against the sheriff, who had the custody of James Loving, made returnable to this court.

The legal service of the writ was waived, as was also the production of the body of the person, who, it was charged, was illegally restrained of his liberty. To this writ, in proper form, the sheriff filed his return, which is partly as follows:

"John P. Gilday, sheriff of Jackson county, Missouri, for his return to the writ of habeas corpus directed to him from the Supreme Court of Missouri, the formal issue of which writ has been waived, states that James Loving was placed in his custody on the 17th day of June, 1903, by an order of commitment issued by Honorable James Gibson, judge of division number 1 of the circuit court of Jackson county, Missouri, and acting as judge of the juvenile court of said county. He says that acting under the authority of an act of the General Assembly of the State of Missouri, approved March 23, 1903, and found in the Laws of 1903 at page 213, said James Loving was brought before the Honorable James Gibson, judge as aforesaid, and that upon due information and process and full hearing the said judge committed said James Loving to the Missouri Reform School for Boys."

Accompanying this return, is a copy of the entire proceeding, including the judgment and commitment.

To this return, there is a demurrer filed, which is as follows:

"Comes now the petitioner, by his attorney of record, and demurs to the return of John P. Gilday, sheriff of Jackson county, for the reason that said return does not state sufficient facts to authorize the detention of said petitioner. Petitioner further states that the Act of March 23, 1903, under which the sheriff of Jackson county claims said petitioner is held, is invalid for the reason that said act is in violation of section 53 of article 4 of the Constitution of Missouri; that said act is in violation of sections 1 and 10 of article 10 of the Constitution."

This statement indicates clearly the controverted questions, and it is unnecessary to say more.

This proceeding presents but one question for our consideration. That is the validity of the Act of March 23, 1903, commonly known as the Juvenile Court Act.

We have examined with a marked degree of care, and read with deep interest, all of the provisions of the act of the Legislature involved in this controversy.

We confess, at the outset, that the wise and beneficent purposes sought to be accomplished by this act— the prevention of crime, and the upbuilding of a good and useful citizenship—tends, at least, to the creation of a desire to uphold it; however, in the determination of so grave and important a question as the one with which we are confronted, inclinations and desires should not be consulted, and in approaching the consideration of the questions presented, we hope to do so with that high conception of duty, so appropriately expressed by Chief Justice RYAN in the Milwaukee Industrial School Case, 40 Wis. 333:

"Notwithstanding this prepossession in favor of the statute before us, it is our duty to test all its provisions involved in this case by the letter and spirit of the Constitution, and to hold the restraints and principles of that instrument sacred, as against any provision of any act of the Legislature, however humane or benevolent."

It must be conceded that this act reaches out into a new field of legislation and, in a sense, may be said to be a new departure from the ordinary paths, in the exercise of the functions of that, the co-ordinate branch of the State government; but, in the language of what has been appropriately said elsewhere: "We live in a time of inquiry and innovation, when many things having the sanction of time are questioned, and many novelties jarring with long accepted theories are proposed."

This act is assailed on the ground that it is offen-

sive to and in violation of the organic law—the Constitution of this State.

In the solution of the proposition before us, we must keep in view the familiar principle that, if there is a reasonable doubt existing as to the constitutionality of the act, such doubt must be resolved in favor of its validity. This principle is so well recognized that the mere statement of it is sufficient. In State ex rel. v. Aloe, 152 Mo. 477, it was very clearly and tersely stated:

"When the validity of a statute is drawn in question, the court approaches the subject as one involving the gravest responsibility, and to be considered with the greatest caution. The General Assembly is presumed to have been as careful to observe the requirements of the Constitution in enacting the statute as the court in applying it. Every presumption is to be indulged in favor of the validity of the act, and that presumption is to continue until its invalidity is made to appear beyond a doubt."

To the same effect is State ex rel. v. Pike County, 144 Mo. 277, where it is said:

"It is the duty of the courts to uphold a legislative act unless it plainly and clearly violates the Constitution, and if its language is susceptible of a meaning that will remove the objections to its validity, such interpretation should be adopted. 'A legislative intent to violate the Constitution is never to be assumed if the language of the statute can be satisfied by a contrary construction.' [Endlich on the Interpretation of Statutes, sec. 178.] It is our duty to uphold the act unless it plainly and clearly violates the fundamental law of the State, and, if its language is susceptible of a meaning that will remove the objections to its validity, such interpretation should be adopted."

First. It is urged that this act is in violation of section 28 of article 4 of the Missouri Constitution. The section referred to is as follows: "*Bills must contain*

*but one subject-title.*—No bill . . . shall contain more than one subject, which shall be clearly expressed in its title.''

The title to this act is as follows:

''An act to regulate the treatment and control of neglected and delinquent children in counties having a population of 150,000 inhabitants and over, with an emergency clause.''

It is earnestly urged by counsel for petitioner that the title to this act contains more than one subject. This contention is predicated upon the theory that ''neglected and delinquent children'' constitute two classes of subjects. A fair and impartial analysis of the terms of the title demonstrate that they are not subject to this criticism. The terms ''neglected and delinquent children'' indisputably refer to two classes, but not to classes of different subjects. The subject of the title to this act is *children,* and the terms ''neglected and delinquent'' refer solely to the classes or character of children which are treated of in the body of the act. If there is but one subject, as in the title to this act (*children* being the subject), the use of terms which refer to classes of the one subject is not obnoxious to the provisions of the Constitution.

It may be said, as is argued in this cause, that ''neglected and delinquent children'' are entirely distinct classes, but it does not follow that they are separate and distinct subjects.

The evident purpose of the provisions of the Constitution, relating to the title of the act, was ''to prevent surprise upon the lawmakers by the passage of bills, the object of which is not indicated by their titles, and also to prevent the combination of two or more distinct and unconnected matters in the same bill.''

There is nothing in the title to this act which is calculated to surprise or mislead any one who may read it. The body of the act treats of the subject indicated by the title, and whether the children are designated as

·"neglected" or "delinquent," both classes are germane to the subject of the title, "children."

This court has spoken on this subject in Lynch v. Murphy, 119 Mo. 163. BURGESS, J., speaking for the court, very clearly announced the rule. He said:

·"The generality of a title is therefore no objection to it, so long as it is not made a cover to legislation incongruous in itself, and which by no fair intendment can be considered as having a necessary or proper connection. The Legislature must determine for itself how broad and comprehensive shall be the object of a statute, and how much particularity shall be employed in the title defining it. [Cooley's Const. Lim., 172, 173.]"

MARSHALL, J., in State ex inf. v. Firemen's Fund, 152 Mo. 45, very tersely stated the law upon this subject. He said :

·"When all the provisions of a statute fairly relate to the subject, have a natural connection with it, are the incidents or means of accomplishing it, then the subject is single, and if it is sufficiently expressed in the title the statute is valid."

Mr. Justice HARLAN, in Montclair v. Ramsdell, 107 U. S. 147, in treating of a constitutional provision of New Jersey, similar to ours, says: "The purpose of this constitutional provision was declared by the Supreme Court of New Jersey in State v. Town of Union, 33 N. J. L. 350, to be to prevent surprise upon legislators by the passage of bills, the object of which is not indicated by their titles, and also to prevent the combination of two or more distinct and unconnected matters in the same bill. It is not intended to prohibit the uniting in one bill of any number of provisions having one general object fairly indicated by its title. The unity of the object must be sought in the end which the legislative act proposes to accomplish. The degree of particularity which must be used in the title of an act rests in legislative discretion, and is not defined by the Constitution. . . . It is not intended, by the Con-

stitution of New Jersey, that the title to an act should embody a detailed statement, nor be an index or abstract of its contents. The creation of an independent municipality being expressed in the title, the act in question properly embraced all the means or instrumentalities to be employed in accomplishing that object. As the State Constitution has not indicated the degree of particularity necessary to express in its title the one object of an act, the court should not embarrass legislation by technical interpretation based upon mere form or phraseology. The objections should be grave, and the conflict between the statute and the Constitution palpable, before the judiciary should disregard a legislative enactment upon the sole ground that it embraced more than one object, or if but one object, that it was not sufficiently expressed by the title."

The North Dakota Supreme Court, in State ex rel. Kol v. Childrens' Home Society, 10 N. Dak. 493, 88 N. W. 273, very clearly settles this question. It said:

"The Constitution only requires that the act shall contain a single subject or object of legislation, and that such subject or object shall be expressed in the title. It is not intended, neither is it required, that the separate means or instrumentalities necessary to accomplish the object of legislation shall be embodied in separate acts. 'Such a requirement would be absurd, rendering legislative acts fragmentary, and they would often fail of their intended effect, from the inherent difficulty of expressing the legislative will when restricted to such narrow bounds. The section of the Constitution under consideration is found in the Constitution of a majority of the States, and it is universally held, and we think necessarily, that an act which has but a single purpose, and that purpose is expressed in its title, may embrace all matters which are naturally and reasonably included in it and all measures which will or may facilitate the accomplishment of the purpose of the legislation."

This leads us to the consideration of the most vital proposition involved in this proceeding. It overshadows all other questions presented. That is, that the "Juvenile Court Bill" is "in conflict with and offends the organic law of this State in this; it is both a local and a special law." The constitutional provision upon which this contention is predicated is as follows:

Article 4, sec. 53. *"Special and Local Laws Prohibited.*—The General Assembly shall not pass any local or special law. . . .

"In all other cases where a general law can be made applicable, no local or special law shall be enacted; and whether a general law could have been made applicable in any case is hereby declared a judicial question, and as such shall be judicially determined, without regard to any legislative assertion on that subject.

"Nor shall the General Assembly indirectly enact such special or local law by the partial repeal of a general law; but laws repealing local or special acts may be passed."

Sections 1, 2 and 3 of this act provide:

"Sec. 1. This act shall apply only to children under the age of sixteen years, not now or hereafter inmates of any state institution, or any training school for boys, or industrial school for girls, or any institution incorporated under the laws of this State: Provided, that when jurisdiction has been acquired under the provisions hereof over the person of a child, such jurisdiction shall continue for the purposes of this act until the child shall have attained its majority. For the purpose of this act the words 'neglected child' shall mean any child under the age of sixteen years who is destitute or homeless, or abandoned, or dependent upon the public for support, or who habitually begs or receives alms, is found in any house of ill fame, or with any vicious or disreputable person, or who is suffering from the cruelty or depravity of its parents, or other person

in whose care it may be. The words 'delinquent child' shall include any child under the age of sixteen who violates any law of this State, or any city ordinance. The word 'child' and 'children' may mean one or more children, and the word 'parent' or 'parents' may be held to mean one or both parents, when consistent with the intent of this act. The word 'association' shall include any corporation which includes in its purposes the care or discipline of children coming within the meaning of this act.

"Sec. 2. The circuit courts exercising jurisdiction in counties having a population of 150,000 inhabitants and over in this State, shall have original jurisdiction of all cases coming within the terms of this act. The city of St. Louis shall be deemed to be a county within the meaning of this act.

"Sec. 3. In said counties the judges of the circuit court shall, from time to time, designate one of their number, whose duty it shall be to hear and determine for such time as such judges shall designate, all cases coming under this act. A courtroom to be designated the 'Juvenile Courtroom' shall be provided or assigned for the hearing of such cases, and the proceedings of the court in such cases shall be entered in a book or books to be kept for that purpose, and known as the Juvenile Record, and the court may for convenience be called the Juvenile Court. The practice and procedure prescribed by law for the conduct of criminal cases so far as same may be applicable and when not herein otherwise provided, shall govern all proceedings under this act. In all trials under this act, any person interested therein may demand a trial by jury."

It is conceded that this act at present is applicable alone to the city of St. Louis and Jackson county, as no other county in the State at present has a population as great as 150,000.

It is also clear that this act has application only to the class of children treated of in the territory desig-

nated, and not to all the children of the State who may be neglected or delinquent.

There can be no dispute that this act does distinguish a class of children to whom the remedies provided for in the body of the act are made applicable; and the most vital and most difficult question presented in this proceeding is not the right to distinguish the class upon which the law is to be operative; but it is in respect to the conditions which would authorize or justify the distinguishing of the class.

If the conditions reasonably justified the distinguishing of the class, and the provisions of the act affects equally all who come within that class, then we think it is clear that the act does not fall within the constitutional inhibition, because of its operation on one class only. This rule was clearly announced in the recent case of State ex inf. v. Washburn, 167 Mo. 680. VALLIANT, J., speaking for the court, in treating of the provision of the Constitution now under discussion, said:

"The clause of our Constitution above quoted does not prohibit the General Assembly passing a statute to affect particularly one class. Since there are classes of individuals and corporations so essentially different from other classes as that a law designed to apply to all would apply to some in one way and to others in another, or to some in one degree and to others in a larger degree, it becomes absolutely necessary that laws should be made to affect particular classes, else the very inequality sought to be avoided would be produced. A law might be uniform in theory yet in its operation produce unjust discrimination, discriminating in effect by failing to discriminate in form, that is, by failing in shape to fit the unequal conditions to which it must apply. Therefore, a law is not within the constitutional inhibition because it is designed to operate on one class only, provided the conditions reasonably justify the dis-

tinguishing of the class, and provided it affects equally all who come within that class. [Hamman v. Central Coal and Coke Co., 156 Mo. 232.] But if the attempted classification be arbitrary or if the statute essays to confer a 'right, privilege or immunity' upon one or some in the class and not upon all, the act is invalid.''

The terms of this act in section 2, restricting the application of its provisions to counties "having a population of 150,000,'' are not sufficient to stamp it a local or special law. This proposition has frequently had the attention of this court, and it has uniformly held that such a provision, reasonably interpreted, has application to counties which may in the future acquire the population designated in the statute. This question was sharply presented in the cases of State ex rel. v. Marion County Court, 128 Mo. 427, and Lynch v. Murphy, 119 Mo. 163. It was said by BARCLAY, J., in the former case:

"The fact that the proviso applies only to counties of a certain population is not of itself enough to stamp it as special (local) in view of the rulings that have been made on that subject in the early years of the present Constitution. [State ex rel. v. Tolle, 71 Mo. 645; State ex rel. v. Herrmann, 75 Mo. 340; State ex rel. v. Miller, 100 Mo. 439.] Whatever the present members of the court might hold on that proposition, were it an original one, is needless to state. We feel ourselves in duty bound to follow the construction that has been made by our predecessors in respect of the proper forms of legislation, and upon which construction the legislative department has ever since been acting. It certainly is a point calling for a firm application of the doctrine of *stare decisis*. We think a fair reading of the proviso permits the interpretation that it is designed to apply to counties that may have the stated population at any time after the statute takes effect. That idea is not expressed in so many words; but, as the law is of continuing operation, and employs the present tense—

'having' such a population—and a prospective effect is to be given to a statute where its language does not exclude that construction, we consider that the interpretation above indicated is reasonable, and should be accepted to sustain the action of the lawmaking department. Where a statute is fairly susceptible of a construction in harmony with the Constitution, that construction should be adopted, in obedience to several canons for the guidance of courts in dealing with this subject.''

BURGESS, J., in treating of the same act involved in the Marion County case, supra, said:

"It may be true and doubtless there are counties in the State which have no dramshops, or that have no township indebtedness, and to which for that reason, the act does not apply, but it is nevertheless general in its application because it does apply to all road districts and townships, including those which have compromised their indebtedness. It could not be more general in its application.'' [Lynch v. Murphy, 119 Mo. l. c. 173.]

In State ex rel. v. Tolle, 71 Mo. 645, the constitutionality of section 320, Revised Statutes 1879, which made its provisions applicable in all cities *having* a *population* of more than 100,000 inhabitants, was involved. This court, interpreting the terms of that statute, which is similar, in respect of having the required population, to the one before us, held it was not a special law within the meaning of the Constitution.

State ex rel. v. Herrmann, 75 Mo. 340, 354, relied upon by counsel for petitioner, fully recognizes the distinction between the terms of the statute involved in that case and the terms employed in statutes similar to the one in this act. It was there said by the court:

"But the statute under discussion in Tolle's case differs very widely from the one we are discussing. The section passed upon in that case was section 320, Re-

vised Statutes 1879, which made provision that 'in all cities having a population of more than 100,000 inhabitants, a board consisting of the judges of the circuit court of such cities, or a majority of the same, shall on or before the 1st day of November, 1879, and every two years thereafter, cause to be published,' etc. That section related to 'persons or things as a class' and, therefore, filled the definition of a general law. It did not single out and relate to 'particular persons or things of a class.' And more than that, it would only operate, and was only intended to operate, in the future, and its general rule would operate as fast as cities having a population of 100,000 inhabitants should give occasion to apply the law.''

In Ex parte Lucas, 160 Mo. 218, the interpretation of the provisions applicable in the Herrmann case, supra, and State ex rel. v. Jackson County Court, 89 Mo. 237, is very clearly distinguished. In the Lucas case, the statute regulating the practice of the occupation of barber was in judgment. MARSHALL, J., in a full and careful review of those cases, makes the distinction adverted to very clear. He said:

''Section 1 of the act, however, closes with this additional proviso: 'Provided that the provisions of this law shall not apply to barbers in any city, town or village containing less than 50,000 inhabitants.' And it is asserted that because it does not cover cities that may hereafter attain a population of 50,000 inhabitants, it is obnoxious to the charge of being a special law, as defined in State ex rel. v. Herrmann, 75 Mo. 340, and State ex rel. v. County Court of Jackson County, 89 Mo. 237.

''In Herrmann's case the act was held to be special because it applied only to cities of 100,000 inhabitants, and St. Louis was the only city that at that time filled this description, and only to such notaries as held commissions bearing date prior to the passage of the act.

''In the Jackson County case, the act was held

special because it attempted to establish reform schools
for juvenile offenders 'in all counties in this State in
which there is located a city of over fifty thousand in-
habitants,' and Kansas City was then the only city in
the State that filled this designation, and therefore, as
the act was intended to act only presently and not pro-
spectively, it could never apply to any county except
Jackson. But neither of the acts construed in those
cases is like the act involved in this case. Here the act
on its face, by its terms and under the machinery it
provides, treats not only of the present, but deals with
the future. It creates a permanent board of examiners.
It permits barbers who are practicing their vocations
at the date of the act to continue to do so, simply requir-
ing them to apply for a certificate each year there-
after.''

The terms ''in counties having a population of
150,000 inhabitants and over,'' as provided in section 2
of this act, do not limit or restrict the operation of the
provision to counties having the required population
at the time of the passage of the act, but is applicable to
all counties that might in the future attain the desig-
nated number of inhabitants. This conclusion is not
only supported by the numerous cases heretofore cited
and discussed, but is fully sanctioned by the uniform
expression of this court upon similar provisions in the
cases of State v. Hayes, 88 Mo. 344; Ewing v. Hob-
litzelle, 85 Mo. 64; State ex rel. v. Wofford, 121 Mo. 61,
and numerous other cases.

It is urged that this act is a special or local law,
for the reason that it applies a rule of procedure and
punishment to a class of children in certain counties
that is not applied to the same class in the other coun-
ties of the State. That is true, and that presents the
difficult question for solution in this proceeding. That
there are in nearly every county of this State ''neglected
and delinquent children,'' as contemplated by this act,
must be conceded. The class of children treated of in

the act, being in existence in all the counties, leads us to the examination of the reasons, justifying the law-making power to distinguish between the classes and make the law applicable to that class within certain counties of a designated population.          •

It has long been recognized that the Legislature could distinguish classes of subjects to which it would make its legislative provisions applicable; but there should always be conditions which reasonably justify this distinction. This distinction is clearly drawn in the Lucas case, in respect to barbers. Barbers practice their occupation in every county of the State; they belong to the same class of subjects as those barbers who reside in cities of 50,000 inhabitants, yet the law-making power distinguished between the same class, and enacted a law which was applicable alone to that class who practiced their occupation in certain cities. This law was correctly held valid, on account of the condition surrounding the class to which it was made applicable. It might, with equal propriety, be said as to that law, that it imposes a burden-or punishment upon a barber in one locality and that a barber, for doing the same thing in another community, is exempted from such punishment.

Judge Marshall, in the Lucas case, makes it clear why the Legislature should distinguish between the same class. He says:

"The whole scheme of the act is to protect the health of the people in large cities. The Legislature must be presumed to have known that there is more disease where large numbers of people are congregated and more probability of the spread of disease in large and closely settled cities, than there is in the country or in a small town. History shows that there is greater need of stringent police regulations of all kinds in large than in small cities. It is not unreasonable to believe that the wisdom and experience of the lawmakers may have taught them the greater necessity for regulations

to prevent the spread of contagious diseases through barber shops in large cities, than exists for such regulations in smaller places. The line must be drawn somewhere. Here it was drawn at cities containing 50,000 people. The same reason which would apply such regulations to cities that now contain 50,000 people would make it necessary to apply them to a city that one, five or ten years hereafter attains that population. The act by its terms is continuing, and intended to be a permanent regulation.''

It is apparent that the Legislature, in enacting the law applicable to barbers in large cities, deemed it unnecessary and impracticable to cover the entire State by its provisions, for the reason that the dangers sought to be avoided in the cities did not exist, or, if they did, it was to a very limited extent.

The same principle announced in the Lucas case and the reasons underlying the application of it, are very clearly stated by this court in State v. Ebert, 40 Mo. 186. The principles announced in that case are particularly appropriate to the one before us, for the reason that the Legislature, by an act, organized a new court, and modified the remedy and the form of procedure in that class of cases coming within its jurisdiction. It was said by WAGNER, J., speaking for the court:

''There is another point which arises on the record which presents more difficulty, and that is, whether the act does not violate that clause in our Constitution which says, 'the General Assembly shall pass no special law for any case for which provision can be made by a general law; but shall pass general laws providing, so far as it may deem necessary, for the cases enumerated in this section, and for all other cases where a general law can be made applicable.' The section in which this provision is found enumerates and places a prohibition on many acts which were theretofore subjects of special legislation. The law in question does not fall within

the specific acts prohibited in the enumeration; but if obnoxious to objection, it must be on account of the words 'all other cases where a general law can be made applicable.'

"The law establishes and organizes a new court, and confers special jurisdiction; this is within the undoubted province of legislative power.

"To promote the ends which led to the creation of the new court, it was necessary to change and modify the remedy and forms of procedure in that class of cases coming within its jurisdiction. The court itself would not be necessary throughout the State, nor would a general law with like or similar provisions be applicable to the whole State. In a large city like St. Louis, where vice and crime spring up and multiply, it may be not only necessary, but even indispensable, for the public good, and to protect the public morals, to institute in case of misdemeanors a more summary mode and manner of proceeding than by the slow, expensive and cumbersome process of indictment. It is in the nature of a police or municipal regulation, and although highly necessary in one community, it may be wholly inapplicable to another."

It is clear that the court regards it no longer an open question that the Legislature has the power to reach out and furnish to densely populated cities such legislation as conditions require, which would be totally impracticable to the rural districts of the State.

Doubtless the Legislature, in the enactment of this law, deemed it wise, as well as just, to furnish to a class of children living in densely populated cities, an opportunity for reform, which was not necessary to extend to all the counties of the State, and the reasons for the limitations of the application of this law can not be more appropriately stated than is done by counsel for respondent:

"It seems hardly necessary to explain why the application of this law was so limited, for it is self-evident

that there would be practically no necessity for such a provision in purely agricultural communities where families live miles apart and where parental authority is ever present. In such states of society there is little or no corruption or contamination to affect the delinquent or neglected. In the Lucas case this court clearly recognizes the danger of infection from bodily disease in communities with congested populations; in this act the danger of moral infection is recognized as equally imminent. The practical side of the question is the one upon which the legislators must of necessity base their action and one which the courts of this State have never failed to see, appreciate and uphold. The many localities in this State where it would be useless, burdensome and absolutely unjust to impose upon the citizens the expense necessitated by this act where the evil to be remedied exists little, if at all, and where the benefit to be derived would be reduced to a minimum, show clearly that the limitation is based on a rational and practical basis. The threatening evil and imminent danger to society due to the congregation of dense populations and the resulting vice and lawlessness in the large centers of population throughout this county, is only too well known to all who are in any way conversant with the trend of modern sociological development. As the evils to which this act is aimed are due in a large measure to these conditions, so the remedy, to be co-extensive with the evil, must be based upon a classification recognizing these conditions. This view has been frequently stated and upheld by this court.''

It is next urged that this act ''is in conflict with the fundamental idea on which such legislation is based, in this: it does not provide for the separation of the neglected child from the delinquent child.''

A similar insistence was made in the case of the Milwaukee Industrial School v. Supervisors of Milwaukee County, 40 Wis. 336. This objection is fully

met by the court, in its clear and logical discussion of it. The court said:

"It was strongly objected to the statute, that it authorizes the same disposition of children destitute by misfortune, and of children convicted of crime; committing them alike to these schools, during minority, there to associate together. It must be remembered, however, that this evil, if evil it be, is subject to judicial discretion, and that in sentencing criminal children courts will not overlook the discretion to confine them in ordinary prisons or in these schools, or the degree of depravity of convicted children, or the liability of destitute children in these schools to be demoralized by association. Children guilty of crime are not always, perhaps not often, so depraved as to make their presence in such schools dangerous to their associates. The State, providing for children dependent upon it, whether from indigence or crime, has an essential discretion in the manner of doing so. And it appears to have been in the mind of the Legislature, that children guilty of accidental offenses might be more sure to gain than children destitute by misfortune would be to lose by the association, under the careful discipline provided by the act, subject to the supervision of the State Board of Charities and Reform. But, if the objection were as grave as represented, it would be a defect of detail only, not of power; a blemish, not surprising in the infancy of so benign a reform, and readily to be obviated in time by amendment of the statute."

This act is in perfect harmony with the important duty of the public in the promotion of good citizenship. It is not only a duty that the lawmaking power owes the public to provide for the application of certain remedies which will tend to reform, and, at the same time, protect the neglected and delinquent children, but it is a clear right which that branch of the government can and should exercise.

As to the exercise of the right there can be no ques-

tion. It is very aptly and most forcibly expressed in
Ex parte Crouse, 4 Wharton (Penn.) 1. c. 11:

"It is to be remembered that the public has a para-
mount interest in the virtue and knowledge of its mem-
bers, and that, of strict right, the business of education
belongs to it. That parents are ordinarily intrusted
with it, is because it can seldom be put into better
hands; but where they are incompetent or corrupt, what
is there to prevent the public from withdrawing their
faculties, held, as they obviously are, at its sufferance?
The right of parental control is a natural but not an in-
alienable one. It is not excepted by the Declaration of
Rights out of the subjects of ordinary legislation; and
it consequently remains subject to the ordinary legis-
lative power, which, if wantonly or inconveniently used,
would soon be constitutionally restricted, but the com-
petency of which, as the government is constituted, can
not be doubted. As to abridgment of indefeasible
rights by confinement of the person, it is no more than
what is borne, to a greater or less extent, in every
school; and we know of no natural right to exemption
from restraints which conduce to an infant's welfare.
Nor is there a doubt of the propriety of their applica-
tion in the particular instance. The infant has been
snatched from a course that must have ended in con-
firmed depravity; and not only is the restraint of her
person lawful, but it would be an act of extreme cruelty
to release her from it."

It is also insisted that the provisions of this act are
in conflict with certain provisions of the charter of Kan-
sas City, in respect to the exercise of jurisdiction by the
police judge, in pursuance of certain ordinances cover-
ing some of the matters that are included in this act.
We will say, upon that proposition, that this being a gen-
eral law, as applicable to the class of subjects treated
of, the charter provisions would be inoperative. The
provisions of the charter must be in harmony not only
with the Constitution of the State, but as well, its gen-

eral laws.    This is clearly settled in the discussion of the cases of Kansas City v. Oil Co., 140 Mo. 1. c. 469, and Kansas City v. Bacon, 147 Mo. 259.

The provisions of this act were made for the benefit of the densely populated cities, and counties, attaining the population designated by the act itself, and it is not violative of sections 1 and 10 of article 10 of the Constitution, that the localities for whose benefit the law was enacted should be required to pay the cost and expenses of carrying out its provisions.    [State ex rel. v. Mason, 153 Mo. 23; State ex rel. v. Board of Education, 141 Mo. 45; State ex rel. v. Owsley, 122 Mo. 68; Young v. Kansas City, 152 Mo. 661.]

This is a new law, going out into a comparatively new field of legislation, and it can not and must not be expected that it would be complete in all the minor details for its enforcement, but these imperfections can not be made the basis of attack on its constitutionality.

The Legislature doubtless felt that the conditions surrounding the children in large cities, the temptations that daily beset them, the increased danger of such surroundings, justified the distinction made, in the application of this act, and being a co-ordinate branch of the government, due respect should be given the judgment of this branch of the State government, as to whether or not such conditions surrounded the subject of legislation as to authorize and justify the distinguishing features of the act before us.

We are dealing not only with a delicate and tender subject, but also an important one.    Every good citizen feels a deep interest in the betterment of the condition of the children of this State; we can not be unmindful that the perpetuity of good government must depend upon the care and attention given those into whose hands it must eventually fall.    Hence, it is not only our duty, but in perfect accord with the instincts of a good heart, to imitate the example of our Divine Savior, in manifesting, on all occasions, our interest in this sub-

Ex parte Loving.

ject, as he did, in the announcement to his disciples— "Suffer little children to come unto me, and forbid them not, for of such is the kingdom of God."

We have thus given expression to our views upon the questions involved in this proceeding. We have reached the conclusion that the act before us is a valid exercise of the legislative power, under the Constitution of this State. While this conclusion is reached, the question as to the constitutionality of this act is not without doubt; but following the well-settled doctrine upon this subject, all reasonable doubts must be resolved in favor of the validity of the act. This we have done in this case.

We highly commend the spirit manifested by members of the bar in the presentation of the questions involved. It was simply a legal proposition, discussed upon a high plane, and for the sole and unselfish purpose of obtaining a judicial expression upon the validity of an act in which the public has a deep interest.

We have declared the act valid. Its proper and successful enforcement depends largely upon the people and upon the conduct of the legal profession of the cities and counties to which it applies. If its provisions are enforced with the same spirit that has prevailed in the submission and discussion of the question involved, then there is no longer any doubt as to the benefits to be derived from this act by the children, their parents, and the public.

With these views, James Loving will be remanded to the custody of the sheriff. All concur.