[No. 19003.  Department Two.  January 3, 1925.]

THE STATE OF WASHINGTON, *Respondent*, v.
PIERCE COUNTY, *Appellant.*[1]

INSANE PERSONS (13, 15)—LIABILITY FOR SUPPORT BY PUBLIC AU-
THORITIES—CONSTITUTIONAL AND STATUTORY PROVISIONS. Rem. 1923
Sup., § 6930, providing that the state shall pay for the expense of
the care of the violent and dangerous indigent insane committed to
the state hospital, and that the counties from which they were
committed shall maintain the harmless inmates, is not violative of
Const., Art. 13, § 1, providing that institutions for the benefit of the
insane shall be "fostered and supported" by the state "subject to
such regulations as may be provided by law."

TAXATION (6, 11)—SUPPORT OF INSANE PERSONS—EQUALITY AND
UNIFORMITY. Rem. 1923 Sup., § 6930, requiring counties from which
harmless indigent insane are committed to the state insane asylum
to pay the cost of their care, while the state pays for the mainte-
nance of the dangerous inmates from a state levy, is not violative
of Const., Art. 7, § 2, requiring uniform and equal assessment and
taxation.

SAME (5)—POWERS OF STATE—COUNTIES—LIABILITY FOR SUPPORT
OF INSANE PERSONS. Rem. 1923 Sup., § 6930, requiring counties from
which harmless indigent insane are committed to the state insane
asylum to pay the cost of their care, is not violative of Const.,
Art. 11, § 12, providing that the legislature shall have no power to
impose taxes on counties or other municipalities or the inhabitants
thereof.

CONSTITUTIONAL LAW (103, 126, 137)—DUE PROCESS—EQUAL PRO-
TECTION OF LAWS—INSANE PERSONS—LIABILITY FOR SUPPORT. Rem. 1923
Sup., § 6930, requiring counties from which harmless indigent in-
sane are committed to the state insane asylum to pay the cost of
their care, is not violative of the 14th amendment of the Federal
constitution regarding the equal protection of and due process of
law; since the county's revenue is subject to legislative control,
and due process is accorded by the proceedings before the judge
conducting the hearing.

INSANE PERSONS (15)—LIABILITY FOR SUPPORT—COUNTIES—DOMI-
CILE OF INCOMPETENT. Rem. 1923 Sup., § 6930, requiring counties
from which harmless indigent insane are committed to the state
insane asylum to pay the cost of their care, is not objectionable
because the maintenance is not charged to the county of the in-
mate's domicile, the matter resting entirely in legislative discretion.

[1]Reported in 231 Pac. 801.

Appeal from a judgment of the superior court for Pierce county, Clifford, J., entered September 24, 1924, in favor of the plaintiff, upon overruling a demurrer to the complaint, in an action by the state to recover the expense of maintenance and care of insane persons committed to a state hospital. Affirmed.

*J. W. Selden, Frank D. Nash,* and *D. D. Schneider,* for appellant.

*The Attorney General* and *R. G. Sharpe, Assistant,* for respondent.

MACKINTOSH, J.—The legislature, in 1923, passed an act which appears as ch. 145, Laws of 1923, p. 466, relating to the admission of the insane to state hospitals and providing for the charges to be paid by persons and counties for the care and maintenance of such insane. Section 1 outlines the procedure for the examination of relatives of the insane persons for the purpose of determining the ability of the insane person, his estate or relatives, to pay for the expense of his care and maintenance while in the state hospital. If the insane person, his estate or relatives are found to have the financial ability to pay such expenses, they shall be ordered to pay the sum of $4.50 per week during the time that such insane person is confined in the hospital. It is further provided that, if the court find that such insane person, his estate or relatives have not the financial ability to pay such amount, and that the insane person is "violently insane and dangerous to life and property, the expenses shall be borne by the State of Washington." If the court find that the insane person, his estate or relatives have not the financial ability to pay the charges and costs, and that such insane person should be committed and is not violent or dangerous, then the costs and charges shall

be paid by the county from which the commitment is made.

This action was begun by the state of Washington against Pierce county, under the last mentioned provision, to recover costs and charges arising from the confinement in the western state hospital for the insane of several persons who are not violently insane or dangerous to life and property, and whose estates and relatives and they themselves had not the financial ability to pay the expenses. To the complaint Pierce county demurred, and the demurrer being overruled and the county electing to stand thereon, judgment was entered for the amount prayed for, and this appeal followed.

The provisions for the payment by the counties of the expenses mentioned in ch. 145, *supra,* are attacked on several grounds, which we will consider seriatim.

(1)   Section 1, article 13, of the state constitution reads as follows:

"Educational, reformatory and penal institutions, those for the benefit of blind, deaf, dumb or otherwise defective youth, for the insane or idiotic, and such other institutions as the public good may require, shall be fostered and supported by the state, subject to such regulations as may be provided by law. The regents, trustees, or commissioners of all such institutions    .    .    .    shall be appointed by the governor    .    .    .    "

It is argued that, under this section, it becomes the duty of the state to support the insane, and that it is impossible for the legislature, without doing violence to the constitutional provision, to provide that support shall be given by the counties. The constitutional provision that the insane hospitals shall be "fostered and supported by the state" does not call for such restricted interpretation as that urged by

the appellant. It must be that the constitution would allow the legislature to determine the sort and nature of insanity for which the state should confine a patient and render him maintenance and treatment. The legislature has provided that those dangerously insane are the ones for whom the state should pay all the expenses, and in the exercise of its discretion allowed by the constitution the legislature has differently classified those who are not dangerously insane, in the view probably that their treatment and maintenance concerns primarily the community from which they come and not the state generally, and has said that the expense of their care and maintenance shall be borne by their counties. Furthermore, this classification seems to be justified under the last clause of the constitutional section quoted, reading that "subject to such regulations as may be provided by law." If the fostering and support by the state is subject to regulation of the legislature, it would seem clearly to follow that that regulation may take the form it did in ch. 145 of providing that each county shall pay the expense of the care of its harmless insane.

This same question has been before the courts of other states, and we find in *State ex rel. Price v. Huwe,* 105 Ohio St. 304, 137 N. E. 167, under a constitutional provision exactly the same as § 1, article 13, of our constitution, that an act of the legislature requiring that the expense of maintaining the insane shall be borne by the county from which they are committed was upheld, the court, after saying that it was elementary that statutory enactments must be sustained and enforced unless clearly in conflict with the constitution, and after saying that the constitutional provision is not self-executing and that the method in which insane asylums are to be fostered and supported was left to the discretion of the legislature, proceeds to say:

"If the requirement that individuals liable for the support of a person committed to such institution pay a portion of the expense of his maintenance, or that it be realized out of the property of such person himself, is not in conflict with the constitutional provision referred to, it is difficult to see how a requirement that in the event of indigency the county from which the patient is committed shall bear such expense is violative of such constitutional provision. The *institution* is fostered and supported by the state, notwithstanding the requirement that those able to support and liable for the support of a patient committed thereto, be required to contribute to such expense, and that where such conditions do not obtain the county from which the patient is committed be required to do so. . . . No charge is made against any county for the care and maintenance of any person committed to such institution from any other county, and in that respect the benefits conferred, and for which such payments are required, are entirely local in their character. Whatever tax levy may be necessary for such purpose would be uniform throughout the taxing district, and the power of the general assembly to require the payment of such fund, and the consequent levying of a tax to provide it, is not prohibited or limited by the provisions of section 7, article 10, of the Ohio Constitution."

The supreme court of North Dakota, in *State ex rel. McCue v. Lewis,* 18 N. D. 125, considered a constitutional provision requiring that the legislature provide revenues for feeble-minded institutions, saying that it was not beyond the power of the legislature to require the several counties of the state to pay for the expense of those of their residents who might be committed to such institutions:

"It is next contended by appellant's counsel that the institution for the feeble-minded is a state institution, and hence funds for its maintenance must be provided for as prescribed in section 174 of our constitution. While it is true that such institution belongs to the

state, it in no manner follows that the legislature has not the power to provide for its partial or entire maintenance by the respective counties, as was expressly held in the foregoing authorities. The contention that chapter 237 aforesaid is unconstitutional because the payments exacted thereunder constitute a tax in excess of 4 per cent and hence violates section 174 of the constitution of this state, is wholly without merit, the same being based upon a false premise. . . . The whole fallacy of appellant's contention upon this point lies in the unwarranted assumption that, because this institution is owned and controlled by the state, its maintenance and the maintenance of the inmates thereof are necessarily a state charge, and that the legislature has no power to require the respective counties to maintain their indigent inmates or to aid the state in maintaining them. As before stated, the legislature has the undoubted power to require the counties to pay all or any portion of the expense of maintaining such inmates.''

In *Kaiser v. State,* 80 Kan. 364, 102 Pac. 454, a constitutional provision exactly the same as ours was held not to interfere with the legislature's compelling the estates of persons committed to insane hospitals to pay for the cost of the maintenance of such persons there. The principal is the same as that involved where the charge is made upon the counties.

(2) Section 2, article 7, of the state constitution is as follows:

''The legislature shall provide by law a uniform and equal rate of assessment and taxation on all property in the state, according to its value in money, and shall prescribe such regulations by general law as shall secure a just valuation for taxation of all property, so that every person and corporation shall pay a tax in proportion to the value of his, her, or its property. . . . ''

It is argued that that portion of chapter 145, *supra,* which we have under consideration violates this con-

stitutional provision requiring uniform and equal assessment and taxation; that, since the law requires a state levy for the support of these hospitals for the insane, the requirement upon the individual counties to pay the state an additional sum for the care and maintenance of the insane amounts to double taxation. We find, again, that this same question has been elaborately considered by other courts and those decisions so adequately answer the contention that independent argument would add nothing to what has already been said.

In *Bon Homme County v. Berndt,* 15 S. D. 494, 90 N. W. 147, this occurs in the opinion:

"The more important question to be considered is as to the constitutionality of the act of 1891 requiring counties to levy a tax sufficient to repay the state the expenses of the insane patients from those counties. It is contended on the part of the appellants that as the insane asylum is a state institution, and the constitution provides that taxes shall be levied for the support of all state institutions, the duty is thereby imposed upon the state to levy taxes sufficient to support such institutions, and that in fact it has done so, and that imposing further taxation upon the county to pay the expenses of the insane sent by them to the asylum constitutes double taxation. But while it is true that the insane asylum is a state institution, it is nowhere provided that the state may not require the amount expended for the support of such an institution to be refunded to it by the counties. The contention that such proceedings constitute double taxation is more specious than real. Assuming that the state does in the first instance provide for its support by the levy of such taxes, the taxes so levied and expended are replaced in the treasury by the money collected from the various counties, so that the state treasury is reimbursed for the amount it has expended and the money is in fact returned to the taxpayer, by being replaced in the state treasury."

The supreme court of Nebraska, in *State v. Douglas County,* 18 Neb. 601, 26 N. W. 378, says:

"It is insisted that as a levy of tax has been regularly made for the maintenance of the hospital, it is not within the power of the legislature to again tax the people of the several counties for the maintenance of the insane sent to it from such counties; that it is double taxation, . . . It is clearly within the power of the legislature to provide for the maintenance of the insane by general taxation of the state, and to relieve the several counties from the burden, except as they bear their proportion with the other counties of the state; or to require each county to maintain its own insane in hospitals provided by them; or to pay the expense of the maintenance of their insane in a hospital provided by the state . . . we think it is clearly within the legislative power to provide by law and taxation, in the first instance, for the support of the insane by the state, and then require the counties, which otherwise would have to support the insane having a residence within their borders, to repay the state the amount thus expended . . . It is claimed that the tax required to be levied by section 47 is a state tax, and therefore the county has no authority to make the levy, and further, that such levy would be a violation of the fundamental requirement that taxation shall be uniform throughout the state . . . the maintenance of the insane is not necessarily a state burden, and therefore it is within the power of the legislature to require that the tax may be levied and collected by each county for the purpose of reimbursing the state, and we think it is also within the power of the legislature to require the tax so levied to be placed with other taxes going to the state . . . This being true, the requirement of uniformity is not violated, as the tax is uniform throughout the taxing district in which it is levied. . . . "

It is true that this decision was later criticized in *Baldwin v. Douglas County,* 37 Neb. 283, 55 N. W. 875, but we find that court still later, in *State v. Stanton*

*County,* 100 Neb. 747, 161 N. W. 264, reaffirming the doctrine of *Baldwin v. Douglas County, supra,* and saying:

"Clearly the question whether the state shall by general taxation support and provide for the poor, the insane, and the unfortunate, or this duty shall be devolved upon each county as to the citizens domiciled therein, is a question of public policy to be determined by the legislature. The statute under consideration appears to determine that question and to devolve that duty upon the respective counties. The state may not levy more taxes than necessary for public purposes. If all the counties of the state had promptly complied with this statute, the necessary state levy for the support of the insane would have been reduced     .     .     .     If others now comply with it, necessary state levies for the support of these institutions will be reduced and there will be no necessary inequality of taxation."

See, also, *State ex rel. McCue v. Lewis, supra.*

(3) The third constitutional provision which it is claimed the act violates is §12, art. 11, reading:

"The legislature shall have no power to impose taxes upon counties, cities, towns, or other municipal corporations, or upon the inhabitants or property thereof, for county, city, town or other municipal purposes, but may by general laws vest in the corporate authorities thereof the power to assess and collect taxes for such purposes."

The argument is that the charge against the counties for the maintenance of their harmless insane is, in truth, the imposition upon such counties of a tax by the state. In truth and in fact, however, the money raised by the counties to pay their indebtedness under the act is raised by taxes levied by the county and not by the state. In the Nebraska case of *State v. Douglas County, supra,* the court considered this identical question and said:

"Again, it is claimed that if the tax is a county tax, it is not competent for the legislature to make the levy, that such tax can only be imposed by county authority. This is true, but by an examination of the law, it will appear that the tax is not levied by the state or its officers. The state auditor is required to notify the county clerk of each county the amount due from it to the state. The county is charged with the amount in gross. The proper estimates of the amount of tax necessary to pay the indebtedness are made by the county officers, and when the percentage of levy is ascertained by them, it is their duty to levy the tax, and place it against the property in the county. The *tax* is not levied by the state, but by the county, for the purpose of paying an indebtedness due the state, and ascertained by its officers."

To the same effect are the decisions in *State ex rel. Price v. Huwe, supra; Salt Lake County v. Salt Lake City,* 42 Utah 548, 134 Pac. 560; *State ex rel. Faxon v. Owsley,* 122 Mo. 68, 26 S. W. 659; *Ex parte Loving,* 178 Mo. 194, 77 S. W. 508; *State ex rel. Clark v. Haworth,* 122 Ind. 462, 23 N. E. 946; Gray, Limitation of Taxing Power, 630-639; 1 Dillon, Municipal Corporations (5th ed.), page 118.

(4)   The 14th amendment of the Federal constitution, which guarantees equal protection and due process of law, it is claimed, is violated by the act before us, attention being called to the fact that the act does not provide for making the county a party to the proceeding to determine the character of the insanity, or the ability of the insane person, his estate, or relatives, to pay for his care and maintenance, and that, compelling the county to pay the amount provided by the judgment therein, is depriving it of its property without due process.

The first answer to this is that, in dealing with the county's revenue, the legislature is dealing with a subject within its control. There is no question but what

the state is bound by the proceedings, and the county, as a subordinate municipality, is also bound. 15 C. J., p. 581, is especially instructive upon this point:

"The revenues of a county are not the property of the county in the sense in which the revenue of a private person or corporation is regarded. A county being a public corporation existing only for public purposes connected with the administration of a state government, its revenue is subject to the control of the legislature, and when the legislature directs the application of a revenue to a particular purpose, or its payment to any party, a duty is imposed and an obligation created on the county."

And in Smith's Modern Law of Municipal Corporations, Vol. 1, § 758, the same view is expressed in this language:

"The power of appropriation which a legislature can exercise over the revenues of the state for any purpose, which it may regard as calculated to promote the public good, it can exercise over the revenues of a county, city, or town, for any purpose connected with the present or past condition, except as such revenues may by the law creating them be devoted to special purposes."

The supreme court of Utah, in *Salt Lake County v. Salt Lake City, supra,* answered the objection in this way:

"Can a resident of a city object every time a district court, or any other court of competent jurisdiction, enters a judgment in a public matter which in some way affects or may affect some fund of the city to which he contributes as a taxpayer upon the ground that the judgment either directly or indirectly invades the right of local self-government or taxation? The state, as we have already pointed out, in enacting the law in question, simply calls upon its agencies, the counties, and cities to assist in discharging a public duty which in no way affects local self-government.    .    .    .
In what is attempted here the state acts in its sovereign

political capacity; and, unless the law through which it acts is manifestly in violation of some express constitutional provision, the courts have no right to interfere.''

To the same effect see *Chicago v. County of Cook,* 106 Ill. App. 47.

The second answer is that the county really has its day in court, through the representation of it at the hearing by an officer of the state, who becomes an officer of the county, in that the county is but a state agency. The county's interests are protected by the judge who conducts the commitment proceedings. This has been held to be true in other instances and should be equally so here. *State ex rel. Fowler v. Moore,* 46 Nev. 65, 207 Pac. 75; *Baugh v. Baugh,* 37 Mich. 59; *Rehfuss v. Rehfuss,* 169 Cal. 86, 145 Pac. 1020; *Powell v. Powell,* 80 Ala. 595, 1 South. 549; and *People ex rel. Healy v. Case,* 241 Ill. 279, 89 N. E. 638.

The third answer is that, even though the county may be said to have had no opportunity to adjudicate the question of its liability in the commitment proceedings, yet it has not been deprived of its property without due process of law, since, in an action begun to recover the charge against the county, it has full opportunity to raise all the issues and have a full adjudication of all questions it may seek to raise. This same point was raised in *State v. Bateman,* 110 Kan. 546, 204 Pac. 682, and *Guthrie County v. Conrad,* 133 Iowa 171, 110 N. W. 454, by relatives of the insane persons, who claimed that they had not had their day in court. But the courts there said that, in the suits brought to recover from them the amount of the charges, they had ample opportunity to present every objection, and that therefore their property was not being taken without due process of law.

(5)   The last objection to the act is that the charge against the county from which the harmless insane are committed is not proper, but that the charge should be made against the county of such person's domicile. No authority seems to exist either for or against this contention, but it appears to be a matter entirely within the legislative discretion and one with which the courts will exercise no interference.   We are satisfied that the trial court was correct in overruling the demurrer and in sustaining the validity of the chapter in question.   For the reasons stated, the judgment is affirmed.

MAIN, C. J., FULLERTON, and HOLCOMB, JJ., concur.
MITCHELL, J., concurs in the result.