[No. 30202.   Department Two.   March 18, 1948.]

*In the Matter of the Guardianship of* MARCUS V. BURNETT,
*an Insane Person.*[1]

*A. O. Colburn,* for appellant.

*John T. Raftis,* for respondent.

ROBINSON, J.—The petitioner filed in the superior court of Stevens county his application to have Velma Hotchkiss discharged as guardian of his estate.  The application showed that he had been a patient at the Eastern State hospital, but alleges that he had been released from the hospital and was fully competent to manage his own business.  A trial to the court resulted in a denial of petitioner's application, and he appealed to this court.  He assigns as error the action of the trial court in refusing to discharge the guardian and restore him to his estate.

It is the settled law that every person is presumed to be sane and competent; but, when one is adjudged to be of unsound mind and under guardianship, the presumption arises in favor of the continued existence of the incompetency, and, if recovery is claimed to have occurred, the burden of proving it is upon the person making the allegation. 32 C. J. 757; *In re Brown,* 39 Wash. 160, 81 Pac. 552, 109 Am.

[1]Reported in 191 P. (2d) 283.

St. 868, 1 L. R. A. (N. S.) 540; *State ex rel. Thompson v. Snell,* 46 Wash. 327, 89 Pac. 931, 9 L. R. A. (N. S.) 1191; *Roberts v. Pacific Tel. & Telegraph Co.,* 93 Wash. 274, 160 Pac. 965; *Criez v. Sunset Motor Co.,* 123 Wash. 604, 213 Pac. 7, 32 A. L. R. 627; *Fletcher v. Miller,* 185 Wash. 299, 52 P. (2d) 304; *Dean v. Jordan,* 194 Wash. 661, 79 P. (2d) 331; *Kirsher v. Kirsher,* 120 Iowa 337, 94 N. W. 846; and *Fendler v. Roy,* 331 Mo. 1083, 58 S. W. (2d) 459. At the hearing September 26, 1946, upon the application to have himself adjudged competent, the burden was upon appellant to prove that he had recovered his sanity.

Appellant and his wife were married in 1905. Four children, three of whom are living, were born to them. The Burnetts were successful farmers and lived an uneventful life until sometime in 1930 or 1931. March 31, 1931, Mr. Burnett was committed as an insane patient to the Eastern State hospital, and was discharged November 28, 1931. January 16, 1941, he was again committed to the hospital. March 2, 1941, he was transferred to the United States hospital at American Lake, Washington. January 26, 1942, he was returned to the state institution at Medical Lake, from which hospital he was paroled to Wythal Davey, who operated a farm near the hospital.

The record of Burnett's first commitment shows that he had grandiose delusions and delusions of persecution. Some of his delusions were of a religious nature. He thought that he was God. He was very irritable and exalted, and could not be reasoned with at all because he felt that he was answerable to no one.

The record further shows that, in the summer of 1940, he began to express the idea that his wife was smoking marijuana cigarettes. He took samples of food to a doctor in Colville and asked that they be analyzed in order to substantiate the idea that his wife was poisoning him. The record states that he became quite a community problem on that basis, but his wife took no steps to have him committed, and finally a sanity hearing was held at the sheriff's request.

July 12, 1941, appellant's daughter, Velma Hotchkiss, was appointed guardian of the person and estate of her father.

Since the time of appointment, Mrs. Hotchkiss has properly cared for the estate. Eleven witnesses called by appellant were examined at the trial occasioned by the appellant's petition to have his property returned to him. These witnesses, most of whom were well acquainted with appellant, were of the opinion that he was mentally able to care for himself and his property, and successfully farm the land owned by himself and his wife. Opposing lay witnesses Velma Hotchkiss, Albert Hotchkiss, and Stella Burnett were of the opinion that appellant was not mentally sound, and, in fact, was worse than in previous years.

We have the evidence of two doctors and the written report of the third doctor. Petitioner's Exhibit No. 1 consisted of a written report made by Dr. H. Ryle Lewis, specializing in neurology and psychiatry. The report was made at the request of a friend of appellant who testified in this case, and was based on an examination of appellant made in May, 1946. The doctor summed up his finding with the following language:

"My general physical and neurologic studies revealed no evidence of organic brain or central nervous system disease.

"In recounting his commitment to the Eastern State Hospital in March 1941, his subsequent transfer to the Veterans Hospital at American Lake a short time later and his return to the Eastern State Hospital in 1942 this patient showed a tendency to blame his wife for his commitment. He also insisted that she was suffering delusions and he implied that a mistake had been made in his being a patient at the hospital.

"It was my observation at the time of examination that Mr. Burnett still harboured considerable bitterness and suspicion of his wife and had not gained very good insight as to the nature of his own nervous illness.

"Undoubtedly, he has shown improvement and from all I could learn has been living up to his parole agreement since having been placed on parole by the Eastern State Hospital in December 1945.

"From the standpoint of this man's health together with the reasonable protection to which society is entitled I see no advantage in shortening the parole period as advised by the Superintendent at the State Hospital. If some sort of property settlement is possible while this man remains on

parole but still under commitment I think this might be attempted. However, in view of his continued suspiciousness and bitterness toward his wife I think this man is still potentially dangerous and I believe the parole arrangement should be continued until such time as the members of the state hospital staff believe that he is ready for discharge.

"In this instance I am suggesting that the procedure be followed exactly as in any other instance of an individual who has been mentally ill and has been under commitment to a State institution."

Dr. H. A. Perry, superintendent of the Eastern State hospital, is a graduate of medicine, a graduate in psychiatry, and a certified specialist in psychiatry. Doctor Perry has been connected with the state hospital since 1938. He testified that he was acquainted with the case record and history of Mr. Burnett and had discussed Burnett's mental condition with him. Appellant, in discussing his problem with the doctor, maintained that Mrs. Burnett was mentally ill, was addicted to the habitual use of "dope," and was attempting "to get rid of him." The doctor concluded: "I do not feel that he is competent to manage his affairs uninfluenced by an insane delusion."

Dr. Wesley Minzel, engaged in the general practice of medicine at Colville, testified that he first met appellant in the latter part of 1941. At that time, appellant stated that his wife was attempting "to poison him." Appellant brought to the doctor a sample of the material that he thought was poisoned. The doctor examined it and found that it did not contain any poisonous substance. The doctor stated that appellant was a "typical manic depressive." The following evidence of Dr. Minzel is of especial importance:

"Q. Supposing the guardian was discharged and he was allowed to handle his estate as he saw fit. What do you conceive could happen? A. Well, you mean if he were to go back and operate his farm, for example? Q. Yes. A. Well, that is a hard one to answer. The thing can be answered only in a general way, and that is this: that this type of illness is one that carries a very, very poor outlook so far as a permanent recovery is concerned, and that the delusions, particularly those of persecution that they have, are systematized and fixed to the point where their judg-

ment and thinking is influenced by those delusions, that is, whatever the delusion is that they carry. That is more or less the thing that will guide them in their activities and their trend of thought and so on. Those will persist. If he went to the farm and if he continues to live, sooner or later he will have another acute exacerbation similar to those that he had when he was formerly committed to the state hospital. Just how long he would go before another acute spell, again no one can answer. It may be relatively soon, again, he may go on for several months."

The evidence given by appellant when he was called to the stand is sufficient in itself to justify the conclusion reached by the trial court. No good purpose would be served by quoting from the eight pages of the statement of facts given over to the testimony of Mr. Burnett. In the eight pages, he went back to the year 1931 and stated in great detail his version of the facts leading up to his first commitment. He told of writing an article for a local paper; that he did not sleep, and had a strange feeling. He said that he went out in the field and the sun appeared to have an eclipse; that his wife gave him some pills and from then on until his commitment he knew nothing. He admitted that he tried to have his wife arrested and accused her of poisoning a hired man. Many other disconnected statements were made by him concerning his life subsequent to his first commitment to the hospital. His evidence was rambling and incoherent, and indicated that he had an unbalanced mind.

The court, in a memorandum opinion, stated:

"The outstanding evidence on which the Court bases his decision is the testimony given by Mr. Burnett himself, and that, considered in the light of the testimony of Dr. Perry, is very revealing. No one can consider the testimony given by Mr. Burnett himself without being aware of a most distorted mental delusion in reference to his wife. No one would consider for a moment that if there were two partners, one with the mental delusion in regard to the other partner that is possessed by Mr. Burnett, that the one having the delusion would be a fit person capable of managing the partnership business. While I am aware that one can distinguish the partnership from a marital community, yet I believe the analogy is sufficiently close to give one pause in permitting

anyone with the delusions possessed by Mr. Burnett, handling the community property. . . .

"I do not believe that Mr. Burnett is competent to handle this property in question; that it would be highly detrimental to him and probably cause an entire mental breakdown in view of the strife that I believe would ensue in the event were I to discharge the guardianship."

Based upon the record as we find it and upon the conclusion of the trial court, we are clearly of the opinion that appellant did not maintain the burden of proof by showing that he had gained his sanity.

The judgment of the trial court will be affirmed.

MALLERY, C. J., STEINERT, JEFFERS, and HILL, JJ., concur.