[No. 31575. Department Two. May 19, 1951.]

L. D. LLOYD *et al., Plaintiffs,* v. RIDGEFIELD LUMBER
ASSOCIATION, INC. *et al., Defendants.*

KENNETH H. WEBER, *as Receiver, Respondent,* v. A. N.
RAWLINGS *et al., Appellants.*[1]

*Wilkinson & Langsdorf,* for appellants.

*Dale W. Read,* for respondent.

ROBINSON, J.—The controversy in this appeal is between
A. N. Rawlings and C. W. Michael, on the one hand, and
Kenneth H. Weber, as receiver of the Ridgefield Lumber
Association, Inc., an insolvent corporation, on the other.
The background of the matter is as follows:

Beginning sometime in 1946, the corporation operated a
sawmill in Ridgefield, Washington. Later, in 1947, it seemed
advisable to the corporation to make some arrangement to

[1] Reported in 231 P. (2d) 613.

dispose of the refuse and waste of the sawmill operation. Such refuse can be ground up into sawdust by a machine called a "fuel hog," and sold as fuel under the name "hog fuel," sometimes called "sawdust fuel," for which there was considerable demand and a good market.

The corporation consulted C. W. Michael, a manufacturer of sawmill equipment. Michael had a friend, A. N. Rawlings, who had advantageous contracts to furnish large quantities of hog fuel. In 1947 and 1948, Lawrence Biani was president of the corporation. Through Michael, Biani met Rawlings who needed large quantities of hog fuel to fulfill his commitments to various consumers of that product. Biani negotiated with Rawlings, and, after consultation with the directors of his corporation, entered into a written contract with Rawlings, on behalf of the corporation, on January 7, 1948. Despite the length of that instrument, we will quote the body of it in full, omitting only the introductory paragraph, the signatures of the parties thereto, and the notary's certificate. We think the quotation required because the appellants in this case base their appeal almost wholly upon the contention that the trial court erred in interpreting the contract.

"WITNESSETH:

"WHEREAS, the Company owns and operates a sawmill at Ridgefield, Washington and needs a fuel hog in order to increase the efficiency of its operations and Rawlings is desirous of furnishing the same upon the terms and conditions hereinafter stated,

"Now, THEREFORE, IT IS MUTUALLY AGREED AS FOLLOWS:

"(1) Rawlings agrees within fifteen (15) days after date of this agreement to furnish at the mill-site of the Company at Ridgefield, Washington one (1) only complete No. 35 Diamond roller bearing fuel hog which the Company shall, upon delivery, immediately proceed to install, paying the cost of installation, and have the same set up for operating as promptly as possible.

"(2) The Company agrees to furnish all power needed for the operation of said hog and conveyor following its installation. Rawlings will maintain the upkeep of the hog and conveyor for the 2 year period. If the Diamond 35 hog will not handle the refuse, Rawlings will install at his ex-

pense a hog large enough to handle all refuse of said mill. The Company will provide a hog tender at all times while said hog is in operation. The Company also agrees to furnish a power unit for the hog only.

"(3) In consideration of Rawlings providing the Company's mill with the hog, the Company agrees to deliver to Rawlings in bunkers at the mill-site in Ridgefield, its entire output of hog fuel which Rawlings shall be obligated to haul away or dispose of. Unless prevented by circumstances beyond its control, including, without limiting, the generality of the foregoing, shutdowns at the mill, acts of God and fire and other casualty, the Company agrees to make every effort to deliver to Rawlings a minimum of Two hundred fifty (250) units of hog fuel each week during the two year period following the date the *hog goes into operation.*

"(4) Title to the hog and conveyor shall remain in Rawlings during the two year term of this agreement, but upon the expiration thereof, title to said hog and conveyor shall pass to the Company free and clear of any right, title, claim or interest in Rawlings, his successors or assigns.

"(5) No sale of the mill by the Company during the two year term of this agreement shall be made unless the *buyer agrees to assume all of the obligations of the Company hereunder* and to continue to provide Rawlings with the minimum amount of hog fuel as provided herein.

"(6) Subject to all of the other terms and conditions hereof, in the event the Company has not delivered to Rawlings a total of *26,000 units of hog fuel* at the end of the two year term of this agreement, then the Company shall be obligated to continue deliveries to Rawlings at the rate of not less than 250 units per week until the full amount of units (26,000) has been delivered."

Rawlings immediately purchased the Diamond 35 fuel hog, as required by paragraph (1) of the contract, above quoted, and installed it. It proved to be inadequate, and, as required in paragraph (2), he purchased and installed a "Sumner Hog," which cost twenty-five hundred dollars, and began successful operation on February 9, 1948. The entire cost of the equipment and its installation was $12,526.08. At that time, Rawlings did not have that much money at hand, and Michael financed him by paying numerous bills, including the twenty-five hundred dollars

for the "Sumner Hog." When the bills were all in and paid, computation showed that Rawlings owed Michael six thousand dollars. On April 29, 1948, Rawlings and wife gave Michael a mortgage on the following personal property, to wit:

"One complete 'hog fuel' plant complete with 'Sumner Hog,' conveyors, shafting, belting, loader and miscellaneous equipment, parts, tools and personal property of every kind attached to or used in connection with the conduct of the mortgagors' business in said plant, which plant is located on the premises of the Ridgefield Lumber Association at Ridgefield, Washington."

The above quotation is from a photostatic copy of the mortgage on file in the office of the auditor of Clark county, and admitted as an exhibit in this cause. That copy also shows that the mortgagors, in giving the mortgage, certified, under oath:

". . . that we are the sole and exclusive owners of the property described in the within mortgage and in lawful possession thereof; . . ."

At the time the mortgage was executed (April 29, 1948), it is certain that the title to the property therein described was in Rawlings and wife. Our problem is to determine who held title to that equipment when the judgment appealed from was entered. As an approach to that, we find it necessary to state some additional facts. After completing the installation of the fuel hog, Rawlings, who was a resident of Portland, Oregon, moved to Ridgefield, and supervised its operation. On March 7, 1949, the corporation was adjudged to be insolvent, and R. W. Smith was appointed receiver. Mr. Smith died in July, 1949, and Kenneth Weber succeeded him as receiver on the last day of that month. The record in this appeal furnishes us very little information concerning the receivership. We are not informed as to the value of the assets of the insolvent corporation or the amount of its indebtedness or who its creditors are.

Prior to the receivership, the corporation had delivered to Rawlings enough refuse material to grind up into about five thousand of the twenty-six thousand units of hog fuel

that he was entitled to receive under paragraph (6) of the contract, hereinbefore quoted.

Rawlings testified that he conferred with receiver Smith when the mill shut down, and that Smith urged him to leave his equipment there because he hoped to lease or sell the mill, and stated that he thought that, "by my leaving the equipment there, it would further the sale of the mill or in fact better both of us." He further testified that Smith asked him for a list of the property he claimed. He testified that he sent Smith a letter attaching such a list. An alleged copy of the letter and list attached was offered as an exhibit on behalf of Rawlings and Michael. The receiver's counsel asked to see it, and it was handed to him. He said, "I have no objection to this going in." The court ordered it to be received as exhibit No. 4. The letter was dated March 28, 1949, and addressed to R. W. Smith, at Box 386, Ridgefield, Washington. The letter was brief and read as follows:

"Attached, is a list showing equipment owned by me at the Ridgefield Lumber Co., also cost of equipment and installation. Hope this will serve your purpose, if you wish any further information, I will be glad to help."

The property Rawlings claimed was itemized on the list attached. The first item listed was "Sumner 45 Hog, $2,500." This, plus other amounts stated on the list, added up to $12,526.08. However, that total included a labor item of $1,500.

Michael testified that, shortly after Weber became receiver of the insolvent corporation, he went with Rawlings to see Weber, and on being asked to state what conversation Rawlings had with the receiver, he responded as follows:

"Mr. Rawlings spoke to Mr. Weber about the hog and asked him if the same arrangement that he had with the former receiver, Mr. Smith, would be suitable with him or should he take his hog out, and Mr. Weber said that he thought it was better if the hog would stay there, that it was an asset to the mill and if the mill was sold that he could probably sell his hog to whoever purchased the mill to a better advantage than if he took it out and sold it piece meal, and he thought it would be an advantage to the mill

if they leased the mill that whoever leased the mill would want to lease the hog or have the hog in operation."

There is considerable testimony in the record to the effect that the hog would enhance the value of the mill property since the mill had no other means of disposing of bark and other sawmill refuse.

The receiver, with the approval of the court, by an order entered on October 3, 1949, did lease the mill on that date to J. M. Johnston and John Schriber, sometimes referred to in the record as the J. &. S. Lumber Company. The lease was for a term of one year, commencing on October 15, 1949, and ending on October 14, 1950. Weber acknowledged the lease before a notary on October 3, 1949. Paragraph 16 of the lease read as follows:

"It is mutually agreed and understood that certain motors and equipment and structures for the disposal of the waste from the mill belong to A. N. Rawlings of Portland, Oregon, who installed the same under a contract to make and take hog fuel from the waste of the said mill; that use of such equipment by the Lessees herein may be made subject to arrangements between the Lessees and the said A. N. Rawlings."

A separate agreement was at once made between the J. & S. Lumber Company and Rawlings, whereby Rawlings was to operate his fuel hog and its appurtenances, and he did operate it for a time. The J. & S. Lumber Company's operation of the mill was not very successful, and they ceased to operate; whereupon the receiver negotiated a sale of the mill, together with the fuel hog and its appurtenances.

On May 29, 1950, the receiver filed in the court an elaborate instrument, designated "Report of Receiver Pursuant To Order Approving Sale." Paragraph 1 of the report read as follows:

"That negotiations have continued with R. A. Matott as trustee on behalf of a group of purchasers who desire to purchase the complete mill, plant, facilities, equipment, and leasehold of the Ridgefield Lumber Ass'n, Inc., and are willing to pay therefor a total price of $35,000.00 providing they can be delivered all of the items of equipment situated about the premises and property free and clear of liens."

It was recited, in paragraph (4) of the report, that a part of the equipment to be sold was a fuel hog which, together with conveyor and attachments, was situated on the premises, pursuant to an agreement made and entered into on the 7th day of January, 1948, by and between the Ridgefield Lumber Association, Inc. and A. N. Rawlings, of Portland, Oregon, and quoted paragraphs thereof. It was further recited that Rawlings and wife had given the mortgage, hereinabove mentioned, to C. W. Michael, and asserted that title to the fuel hog had passed to the Ridgefield Lumber Association, Inc.; and it was requested that, when the $35,000 was paid into court:

"That the sum of $6,000.00 be held in court, pending determination of the title to the fuel hog as mentioned in the foregoing paragraph IV, and be distributed to Kenneth H. Weber, the receiver herein, if it be determined that title to the said hog has passed, or to A. N. Rawlings and C. W. Michael if it be determined that title remains in A. N. Rawlings, subject to a reduction for the proportionate taxes."

On May 27, 1950, the receiver, through his counsel, moved the court to enter an order directing Rawlings and Michael to show cause, if any they had, why they should not be decreed to have no interest whatsoever in and to the fuel hog and its appurtenances. The order was immediately entered, and Rawlings and Michael were directed to show cause on June 5, 1950, if any they had, why they should not be declared to have no title or interest in the fuel hog and its appurtenances. On that day, they appeared for that purpose, and the hearing resulted in the judgment from which Rawlings and Michael took this appeal. However, before the receiver applied for the order to show cause, another way had been attempted by Weber to get title to the fuel hog and its appurtenances. On May 16, 1950, his attorney wrote the following to Rawlings:

"As per telephone call of this date between yourself and Everal Carson, Attorney at Law, 515 Ford Building, Vancouver, I enclose herewith a form of Bill of Sale to be executed by you covering all of your property holdings located at the Ridgefield Lumber Association mill.

"It is my understanding that you will return this Bill of Sale to either myself or Mr. Carson, to be held for you and delivered upon receipt of payment of $6,000.00, which is to be forwarded to you.

"It is hoped and expected that the transfer can be completed within a day after return of this instrument. We have other such instruments to be accumulated, and then the buyers will turn over the money.

"Yours very truly,

[Signed] Dale W. Read

Dale W. Read"

A bill of sale was enclosed for Rawlings to execute and return. The introductory paragraph read as follows:

"KNOW ALL MEN BY THESE PRESENTS: That A. N. Rawlings, of Portland, Oregon, the Seller, for and in consideration of the sum of Six Thousand ($6,000.00) Dollars, to him in hand paid by R. A. Matott, Trustee, the Buyer, the receipt whereof is hereby acknowledged, does by these presents grant, bargain, sell and convey unto the said Buyer, his heirs, executors, administrators and assigns the following described personal property:   . . ."

The description of the property being conveyed included the fuel hog, "together with motor, conveyors, pulleys and all attachments."

Rawlings signed and sealed the bill of sale on May 17, 1950, and returned it to the receiver's counsel. But, in spite of the fact that, in so doing, he acknowledged the receipt of six thousand dollars, he testified, at the show cause hearing, that he had received no part thereof. There is no evidence that the receiver made use of the bill of sale in making the sale of the mill. This attempt to get a bill of sale from Rawlings in May, 1950, indicates that the receiver was not too sure of the validity of his contention that title to the hog and its appurtenances had passed to him within two years after January 7, 1948, or February 9, 1948, if at all. We note both dates because we are not able to determine when the two-year term of the agreement began. The agreement, or contract, as we have hitherto called the instrument, was entered into on January 7, 1948. Exhibit No. 5, in the record, is denominated an agreement, although it bears but one signature. Its text is as follows:

"This is to certify that on February 9, 1948, the hog at the Ridgefield Lumber Association, Inc. was put into operation.

"It is agreed that this date, February 9, 1948, is considered the starting date of the contract between the Ridgefield Lumber Association, Inc. and A. N. Rawlings."

It is signed, "Claude Freestone, Pres." There is evidence that Claude Freestone was president of the corporation during a portion of the year 1948, and that the signature is in his handwriting.

Although we have, early in this opinion, quoted the entire contract, or, as the parties called it, the agreement, we feel justified in requoting paragraph (4), because the trial judge, giving little or no attention to the other provisions of the agreement, held the title to the hog, conveyor, and other appurtenances passed to the Ridgefield Lumber Association, Inc., by virtue of that paragraph:

"(4) Title to the hog and conveyor shall remain in Rawlings during the two year term of this agreement, but upon the expiration thereof, title to said hog and conveyor shall pass to the Company free and clear of any right, title, claim or interest in Rawlings, his successors or assigns."

The trial judge made no findings as to the date of the expiration of the contract, but, as we have hereinabove noted, the two-year period began either on the day the agreement was made (January 7, 1948) or on the day the fuel hog was put into operation (February 9, 1948). In either case, the contract could not have expired prior to the time Rawlings and wife mortgaged the hog and its equipment to Michael on April 29, 1948, nor prior to the time the company was adjudged insolvent on March 7, 1949; and we have hereinbefore quoted the declaration of Weber in paragraph 16 of his lease to Johnston and Schriber, made on October 3, 1949, that "certain motors and equipment and structures for the disposal of waste from the mill belong to A. N. Rawlings, of Portland, Oregon." Furthermore, whether the two-year period began on January 7, 1948, or February 9, 1948, it is obvious that it could not expire before sometime in 1950. Furthermore, as we have hereinbefore pointed out, the receiver made an attempt to wheedle a bill of sale from

Rawlings of the fuel hog and its equipment as late as May 16, 1950. There was a witness called at the show cause hearing who, having negotiated the agreement and also drafted it, could have interpreted the agreement between the Ridgefield Lumber Association, Inc., and Rawlings, if the trial judge had permitted him to do so. We quote from the statement of facts, beginning at line 15 of page 29:

"Q. Mr. Biani, on the 7th of January, 1948, at the time of the signing up of the contract about the hog fuel you were president of the Ridgefield Lumber Association? A. Yes. Q. And had been president for some time? A. Yes. Q. How long after the date of this contract of January 7, 1948, did you continue to be president of the company? A. I would say pretty close to a year, I guess. Q. During the time you were president the hog fuel was being operated? A. Part of the time, not all the time. Q. And do you know how many units of fuel were furnished under the contract to Mr. Rawlings? A. No, I do not. Q. Mr. Rawlings did receive the fuel from the mill? A. That's right, whenever we was putting it out. Q. And the mill delivered it in bunkers and he took it from there? A. Yes. Q. Was he personally around there all the time? A. Yes. He lived at Ridgefield. Q. Who drew the contract? A. *I drew the paper up and showed it to him for his approval and we signed it together* and had it notarized there by a notary in Ridgefield, Mr. Cornell. . . . [Italics ours.] Q. Now, there are two phases of the contract. There is a provision here that the title passes in two years and also there is a provision that he is to have 26,000 units under this contract. A. That's right. Q. Did you discuss with Mr. Rawlings and your board of directors at the time of the signing of this contract that situation? A. That was the situation. There was that if we gave Mr. Rawlings 26,000 units within the period of two years we were to get it, it was to be turned over to us, the hog, and in case we didn't get the 26,000 units the contract was to keep on. Q. In other words, Mr. Rawlings was still to be in posession of that hog until such time as—A. Until we gave him 26,000 units. MR. READ: I move that be stricken. It is a violation of the parole evidence rule. The agreement is here and speaks for itself. I don't think the testimony of Mr. Biani has any bearing upon it. MR. WILKINSON: I think the question I asked didn't quite call for all the answer that he gave. THE WITNESS: Your Honor, I would like to have the question repeated. (Reporter reads

the question.) THE COURT: The answer of Mr. Biani may be stricken insofar as it is any modification of the written contract or is in conflict with it in any way."

We are at a loss to know what portion of the testimony of Mr. Biani was stricken by that ruling; for, in our opinion, Mr. Biani's testimony did not modify or conflict with the contract in any way.

Here was a sawmill which desired to get rid of the refuse of its operation, contracting with a man who could furnish the means to cut it up into hog fuel, and was himself in need of large quantities of hog fuel to fulfill his contracts to furnish hog fuel to several customers, particularly The Pacific Power and Light Company of Portland, Oregon. According to the evidence, he needed 26,000 units. He was willing to furnish, at the mill site within fifteen days, equipment to convert the mill waste refuse into hog fuel, and was further willing that, if the mill would furnish him sufficient refuse to be converted into 26,000 units of hog fuel within two years after the installation of the fuel hog, the title to the equipment should pass to the company. The company was willing to furnish all power needed for the operation of the hog (paragraph (2)), and, in the event that it had not delivered to Rawlings a total of 26,000 units at the end of the two-year term, to obligate itself to continue deliveries to Rawlings at the rate of not less than 250 units per week until the full amount of units (26,000) had been delivered; for paragraph (6) read as follows:

"(6) Subject to all of the other terms and conditions hereof, in the event the Company has not delivered to Rawlings a total of *26,000 units of hog fuel* at the end of the two year term of this agreement, then the Company shall be obligated to continue deliveries to Rawlings at the rate of not less than 250 units per week until the full amount of units (26,000) has been delivered."

In our opinion, Biani's testimony did not tend to modify the contract or conflict with it in any way, but was wholly consistent with its terms.

The judgment from which this appeal is taken reads as follows:

"IT IS HEREBY ADJUDGED AND DECREED: That A. N. Rawlings and C. W. Michael have no interest of any kind in and to a certain fuel hog, conveyor and appurtenances thereto referred to in the contract dated January 7, 1948; that the title to said property has already passed to Ridgefield Lumber Association, Inc., a corporation, and that the receiver is entitled to take into his possession the $6,000.00 deposited in court by virtue of a stipulation entered into between the parties to this action, said moneys being representative of the fuel hog by virtue of said stipulation in connection with the sale of the sawmill and fuel hog together and that the receiver have judgment against A. M. Rawlings and C. W. Michael for his costs and disbursements to be taxed herein."

We will not set out in full the seven findings of fact and six conclusions of law entered by the trial judge. We do not agree with conclusion of law No. 3, which reads as follows:

"That whatever rights, if any, A. N. Rawlings had by way of ownership in the fuel hog, conveyor and its appurtenances by virtue of the contract have ceased to exist because the title passed under paragraph (4) of said contract and that the Ridgefield Lumber Association, Inc., a corporation, is now vested with title."

While the trial judge held that the title to the hog and its appurtenances passed to the corporation at the expiration of the two-year agreement, he made no findings as to the date of the expiration. There was no evidence given which would have enabled him to do so. Nor did the receiver or his counsel in any way suggest the date. As we have hitherto noted, it could not have expired prior to some date in 1950, since the agreement was entered into by the company and Rawlings on January 7, 1948, and the hog began operation on February 9, 1948; nor could it have expired before Rawlings mortgaged the hog and its appurtenances to Michael on April 29, 1948.. When did the two-year term expire? We do not know the answer. However, we do know that the receiver did not think, as late as October 3, 1949, that it had expired and title had passed; for, on that date, as receiver of the insolvent company, he executed a lease of the sawmill to Johnston and Schriber in which he stated, in

paragraph 16 thereof, hereinbefore quoted in full, that "certain motors and equipment and structures for the disposal of the waste from the mill belong to A. N. Rawlings, of Portland, Oregon, who installed the same under a contract to make and take hog fuel from the waste of the said mill." Furthermore, as we have hereinbefore shown, he practically admitted that the fuel hog and its appurtenances were the property of Rawlings as late as May 16, 1950, only eleven days before he moved the court to enter the order requiring Rawlings and Michael to show cause why they should not be decreed to have no interest whatever in the hog and its appurtenances. As we have hitherto pointed out, on May 16, 1950, Weber, acting through his counsel, offered Rawlings six thousand dollars for a bill of sale of the hog and its appurtenances.

Counsel for appellants, in closing their reply brief, said:

"We suggest all that is needed to dispose of this case is the application of simple justice."

While we do not wholly agree with that, we are of the opinion that the judgment from which this appeal is taken is, under the facts, inequitable. We will not unduly prolong this already too long opinion by enlarging along that line. It seems to us that the receiver lulled Rawlings into security by recognizing his title from time to time during the two-year period.

Appellants' attorneys depended, to a very large extent, upon the equitable doctrine of unjust enrichment. As to that, the trial judge said, in his conclusion of law No. VI:

"The question of unjust enrichment is not in this case under the facts, for the reason that the essential elements of unjust enrichment are not present."

We think that the essential elements are present. As stated on page 272 of Volume 43 of "Words and Phrases," unjust enrichment is defined as follows:

"A person is unjustly enriched if the retention of the benefit would be unjust. Restatement, Restitution, § 1 a.

"Doctrine of 'unjust enrichment' is that [a] person shall not be allowed to profit or enrich himself inequitably at

another's expense. *American University v. Forbes,* 183 A. 860, 88 N. H. 17."

It is stated in the opinion in the case last above quoted:

"The doctrine of unjust enrichment is that one shall not be allowed to profit or enrich himself at the expense of another contrary to equity." (p. 19.)

■ This court has dealt with that doctrine from time to time. See *Hardgrove v. Bowman,* 10 Wn. (2d) 136, 116 P. (2d) 336, and cases cited in that opinion, particularly *Gregory v. Peabody,* 153 Wash. 99, 279 Pac. 102. In our opinion, the really essential elements of unjust enrichment were present in the instant case.

The judgment appealed from is reversed, and, if the six thousand dollars, referred to in the last paragraph of the stipulation between the parties, filed on June 6, 1950, has been deposited in, and held in, court, as was contemplated in the stipulation, it is directed that it be paid over to Rawlings and Michael. It is further ordered that the appellants be entitled to tax their costs in this court.

SCHWELLENBACH, C. J., MALLERY, GRADY, and HAMLEY, JJ., concur.