[No. 47658-6. En Banc. July 29, 1982.]

FOUNDATION FOR THE HANDICAPPED, ET AL, *Appellants,* v. THE DEPARTMENT OF SOCIAL AND HEALTH SERVICES, ET AL, *Respondents.*

*William L. E. Dussault* and *Sweet, Dussault, Neff & Gibbs, P.S.,* for appellants.

*Kenneth O. Eikenberry, Attorney General,* and *Robert M. McDonald, Assistant,* for respondents.

DIMMICK, J.—This is a class action, brought on behalf of all persons currently residing in one of the State's five residential schools for the mentally and/or physically handicapped and all persons having resided in the schools for a period of time since 1967, seeking to have the statute providing for collection of monies for their care declared unconstitutional and for restitution by the Department of Social and Health Services (DSHS) of approximately $83 million. The trial court granted summary judgment in favor of DSHS. We affirm.

Appellant, the Foundation for the Handicapped (Foundation), is a nonprofit corporation. It serves as legal guardian, limited guardian or representative payee, as appropriate, for individuals who are residents of the state schools. The individually named appellants are residents of the state schools which are designed and operated for the education, guidance, care, treatment and rehabilitation of handicapped persons. RCW 72.33.020(4). The residents include persons mentally and/or physically handicapped.[1] Some residents are subject to a legally declared disability requiring the appointment of a full or limited guardian;

---

[1]A mental handicap is defined as: "a state of limited development in consequence of which the individual affected is mentally incapable of assuming those responsibilities expected of the socially adequate person such as self–direction, self–support and social participation." RCW 72.33.020(1). Prior to 1977 the first part of the definition differed. It read: "a state of subnormal development of the human organism". Laws of 1957, ch. 102, § 2(1). A physical handicap is similarly defined as "a state of physical impairment in consequence of which the individual affected is physically incapable of assuming those responsibilities expected of the socially adequate person such as self–direction, self–support and social participation." RCW 72.33.020(2). This definition is essentially the same as when first enacted. Laws of 1957, ch. 102, § 2(2).

others, however, are not legally incompetent.[2]

The State, through DSHS, provides all residents with board, room, clothing, medical treatment as well as educational opportunities commensurate with their respective abilities. Prior to 1967, the State did not charge residents or their families for this care. In 1967 the Legislature adopted RCW 72.33.650–.700, placing financial responsibility for costs of care, support and treatment upon those residents who possess assets over and above the minimal amount required for personal use. We upheld the State's ability to charge the residents and approved the statutory exemptions and provisions for handling the residents' money in *O'Connell v. Conte*, 76 Wn.2d 280, 456 P.2d 317 (1969). RCW 72.33.670 provides that after a determination is made that the estate of the resident is able to pay all or any portion of the monthly charges a notice and finding of financial responsibility is to be served on the resident's guardian. If there is no guardian, the notice is to be personally served on the resident's spouse, parent, or other person acting in a representative capacity and having property in his possession belonging to the resident, and the superintendents of the schools. Those same representatives have the right to appeal the determination of financial responsibility.

DSHS proceeded under RCW 72.33.670 until 1976 when a trial court ruled in favor of a representative payee of a resident who challenged a finding of financial responsibility on the grounds that the statute denied the particular resident due process of law. We agreed and held:

> The statute makes no provision for service upon the resident himself. For most residents, this is apparently

---

[2]It is well settled law that a person is presumed competent. *In re Burnett*, 30 Wn.2d 160, 191 P.2d 283 (1948). A person may be declared incompetent, thus allowing a court to appoint a guardian, only when he is under the age of majority or when he is: "(b) Incompetent by reason of mental illness, developmental disability, senility, habitual drunkenness, excessive use of drugs, or *other mental incapacity,* of either managing his property or caring for himself or both." (Italics ours.) RCW 11.88.010(1).

unnecessary, as most are under legal disability as a result of their minority and/or the appointment of a legal guardian. However, Gary Jenkins is not subject to any legally declared disability. As a result, the statute is defective as applied here in failing to provide for notice to Gary Jenkins. DSHS did not serve notice upon him, thus making no attempt to correct the statutory defect. Due process requires notice reasonably calculated to apprise a party of proceedings which will affect him.

*Duffy v. Department of Social & Health Servs.,* 90 Wn.2d 673, 678–79, 585 P.2d 470 (1978).

I

■ The Foundation in the instant action renews the challenge to the statute's service and appeal requirements. It requests the court to declare RCW 72.33.670 unconstitutional in its entirety. We adhere to our holding in *Duffy* that RCW 72.33.670 is only unconstitutional as applied to a specific factual situation—when a resident is not subject to a legal disability. A statute held invalid as applied is not void on its face or incapable of valid application in other circumstances. 1 J. Sutherland, *Statutory Construction* § 2.06 (4th ed. 1972).

II

The Foundation alternatively contends that our holding the statute unconstitutional as applied to some residents but constitutional as to others violates equal protection guaranties as well as Washington's Law Against Discrimination, RCW 49.60. Such claims are without merit.

■■ The equal protection analysis must begin with the premise that the statute is presumptively valid. *State v. Rhodes,* 92 Wn.2d 755, 600 P.2d 1264 (1979). The Foundation has the burden of proving that the statute is invalid. *State v. Kent,* 87 Wn.2d 103, 549 P.2d 721 (1976). The extent of the burden varies according to the nature of the rights involved. If a fundamental constitutional right or a "suspect" classification is at issue, courts employ a strict scrutiny test and the classification will be upheld only if a compelling state interest justifies the classification. *Darrin*

*v. Gould,* 85 Wn.2d 859, 540 P.2d 882 (1975). If not, the statute will be upheld if it is rationally related to a legitimate governmental objective. *State v. Smith,* 93 Wn.2d 329, 336, 610 P.2d 869 (1980).

■ The "classification" in the present case is between *Duffy*–type adult residents, who are legally competent, and more severely handicapped or juvenile residents who are subject to legal incompetency. All juveniles are in the latter category. Thus, the distinction is not, as the Foundation contends, between severely handicapped and less severely handicapped persons. Rather, the distinction is between those who have been deemed legally incompetent requiring a guardian to manage their affairs and those who have not. Such a distinction in our view does not amount to a suspect classification. Therefore, the rational basis test is the proper standard of review.

■ Since juveniles and more severely handicapped adults are less likely to comprehend the personal notice required to be served upon *Duffy*–type residents, we find a rational basis for distinguishing between the two groups. The rights of handicapped persons subject to a legal disability are best protected by notice to a guardian or other representative. Less handicapped persons not subject to a legal disability are more apt to understand the notice and should be permitted an opportunity to respond on their own behalf as well as through their representatives. Thus, the distinction is premised on the legal competency of the individual and is rationally related to the purpose of the statute, which is to afford each resident with meaningful notice. Such a distinction does not offend the principles of equal protection.

Similarly, this classification does not violate Washington's antidiscrimination law. RCW 49.60.030(1) provides that the right to be free from discrimination because of the presence of a mental or physical handicap is a civil right. The Foundation contends that basing the type of notice that is required on the extent of the residents' handicaps constitutes illegal discrimination. We do not agree. As

noted above, the classification is based upon the presence or absence of a legal incompetency. The incompetency can be based upon age, developmental disability, or severe mental deficiency. RCW 11.88.010(1). There has been no discrimination solely "because of" a mental or physical handicap. Furthermore, no resident has been disadvantaged by the classification. Handicapped persons under a legally declared disability presumably would not benefit from the actual notice which legally competent residents must receive.

### III

In 1976, DSHS began personally serving notices and findings upon those residents who were not subject to a legal disability in addition to serving the representatives listed in RCW 72.33.670. In 1979, after the *Duffy* due process decision, DSHS formalized these procedures by adopting WAC 275–20–080 thus supplying the service provision which RCW 72.33.670 lacked. The Foundation challenges the adequacy of this service and the validity of the administrative rule.

Appellants contend that there is not one resident who is able to comprehend the contents of the notices. They rely upon *Covey v. Somers,* 351 U.S. 141, 100 L. Ed. 1021, 76 S. Ct. 724 (1956) and *In re Hendrickson,* 12 Wn.2d 600, 123 P.2d 322 (1942), as support for its position that service upon the residents is meaningless and thus inadequate. In *Covey* the Court held service of a notice on a person everyone actually knew to be incompetent in that she was without mental capacity to handle her affairs or to understand the meaning of any notice was insufficient. In *In re Hendrickson* this court assailed a statute allowing notice of sterilization to be personally served on a person held in confinement because of mental incompetency without notice to any other representative.

These cases are nongermane to the situation at bar. The relevant statutes unmistakably provide that residents of the state schools include physically handicapped persons. Mental incompetency is not a requisite to admission.

Accordingly, *In re Hendrickson* does not apply nor does *Covey* since the State is not put on notice that every resident is unable to comprehend a notice pursuant to the applicable definitions and statutes.

DSHS personally serves those residents who are not subject to a legal disability. In addition, it serves those residents' spouses, parents or other persons acting in a representative capacity and having property in their possession belonging to the residents, and the superintendents of the schools. We conclude that such notice meets the requirements of due process as it is reasonably calculated to apprise the resident of the proceeding affecting him. *Duffy*, at 679.

■ However, DSHS did not begin properly serving the residents and allowing adequate opportunity to be heard until 1976, at which time it also searched the records and attempted to serve all who had been residents since 1967. The State argues that since it served all residents not under a legally declared disability who had resided in the schools since 1967 such service retroactively cured the statute. Such an argument is unacceptable as the United States Supreme Court has stated that the notice and opportunity to be heard must be at a meaningful time, *i.e.,* prior to terminating public assistance payments, *Goldberg v. Kelly,* 397 U.S. 254, 25 L. Ed. 2d 287, 90 S. Ct. 1011 (1970). Proper service and an opportunity to appeal afforded after the State has charged a resident's estate is insufficient.

■ Appellants challenge the authority of DSHS to adopt WAC 275–20–080 curing the statute's deficiency. This rule was adopted in accord with the Legislature's grant of general duties and powers to DSHS to collect monies from all residents able to pay the costs of their care, treatment and education. RCW 72.33.650–.700. As instructed in *Pacific Cy. v. Sherwood Pac., Inc.,* 17 Wn. App. 790, 794–95, 567 P.2d 642 (1977):

> A statute expressly granting general authority to achieve a lawful objective includes by implication the right to do such acts as may be reasonably necessary to achieve that

objective. *State v. Melton,* 41 Wn.2d 298, 248 P.2d 892 (1952); *State ex rel. Hunter v. Superior Court,* 34 Wn.2d 214, 208 P.2d 866 (1949); *State ex rel. Becker v. Wiley,* 16 Wn.2d 340, 133 P.2d 507 (1943); 56 Am. Jur. 2d §§ 195, 226 (1971); 2A C. Sands, *Statutes and Statutory Construction* § 55.04 (4th ed. 1973).

Since the Legislature granted general collection powers to DSHS, it must have intended that the statute be construed to permit and require personal service on all persons constitutionally entitled thereto because such service is reasonably necessary to achieve the objective of the collection program. It would lead to absurd consequences, which we must avoid in statutory construction, if the agency is given the right to collect from all residents but not the authority to perform those acts necessary to that end. Accordingly, we uphold DSHS's power to adopt WAC 275–20–080.

In sum, we hold that personal service of a notice and finding of financial responsibility on a resident not subject to a legally declared disability in addition to serving those representatives listed in the statute and allowing those residents an opportunity to appeal the determination of financial responsibility comports with due process and has been effective since 1976. However, those residents not subject to a legal disability whose estates were charged for their care in the years 1967 through 1976 were denied due process of law.

## IV

■ The trial court allowed the State to retain funds collected from those residents between 1967 and 1976 on alternative equitable grounds. We affirm on the basis of unjust enrichment. "'The doctrine of unjust enrichment is that one shall not be allowed to profit or enrich himself at the expense of another contrary to equity.'" *Lloyd v. Ridgefield Lumber Ass'n,* 38 Wn.2d 723, 736, 231 P.2d 613 (1951). Clearly the residents received a benefit from the services provided by the State. *See Olwell v. Nye & Nissen Co.,* 26 Wn.2d 282, 285, 173 P.2d 652, 169 A.L.R. 139 (1946).

 The Foundation has never alleged that DSHS engaged in overreaching when dealing with the residents of the schools. Nor does it contend that DSHS collected too much money from any individual. The average monthly per capita cost of operating a state residential school in 1967 was $296; in 1979 the cost exceeded $1,475. The average monthly payment received from a paying resident is approximately $120. The State has collected money from only 40 percent of all residents for the costs of their care, treatment and education and only about six residents have had sufficient assets to pay their full share of the per capita costs of operating the school. The source of 97.5 percent of these funds is social security benefits. The remainder is veteran benefits, railroad retirement benefits and trust accounts. These funds, although grossly inadequate, were designed to provide the very type of care DSHS provided. Furthermore, it is well settled that the State is not required to provide all the funds to support the residential schools. *See State v. Pierce Cy.,* 132 Wash. 155, 231 P. 801, 46 A.L.R. 594 (1925); *State ex rel. Bd. of Comm'rs v. Clausen,* 95 Wash. 214, 163 P. 744 (1917). *See also O'Connell v. Conte, supra; Duffy, supra.* Accordingly, the State is not required to reimburse the money it has already utilized in caring for the residents. Additionally, the costs to the State, if required to repay the money collected between 1967 and 1976, would be great. The administrative costs of searching through old files and records alone would impose a tremendous financial burden on DSHS. We have recognized retroactive class relief will be denied if it places an undue financial burden on the State. *Hanson v. Hutt,* 83 Wn.2d 195, 204, 517 P.2d 599 (1973).

In light of these considerations, we affirm the trial court's summary judgment.

BRACHTENBACH, C.J., and ROSELLINI, STAFFORD, UTTER, DOLLIVER, WILLIAMS, DORE, and PEARSON, JJ., concur.